The defendant was indicted for the murder of Evelyn A. Gentry. When the action was called for trial, and before the jury was empaneled, the Solicitor for the State announced that he did not ask for a verdict of murder in the first degree, but only for a verdict of murder in the second degree, or manslaughter, as the facts might justify. To the charge in the bill of indictment the defendant plead, Not Guilty.
The evidence on the part of the State: That of Rev. C. K. Gentry was to the effect that the lived at Kannapolis, attended religious services in Concord on the night of 12 May, 1927. He was returning home in a Chevrolet touring car; was driving the car and beside him on the front seat was his wife with their grandchild, about ten months old, in her lap. His married daughter, Mrs. Baker, the mother of the child, was in the rear seat on the left side of the car, and Evelyn A. Gentry, the deceased, about 14 years and five months of age, on the right-hand side. At the intersection of Mulberry Street in the outskirts of Kannapolis, with State Highway No. 15, he prepared to make a left-hand turn. Evelyn, who was killed, looked back. He looked back and threw out his hand. Looking forward he saw an automobile about 150 or 200 feet on the highway coming from Kannapolis. Seeing he had plenty of time to *Page 244 
make a left-hand turn, he gradually swung to the left at the rate of 15 or 20 miles an hour, with his hand out as he turned left on the highway. Another pair of headlights flashed into view, the car coming around the car he had first distanced; the car came on them at a tremendous rate of speed. He stepped on the gas and made every effort to escape the highway, and did so with the exception of the rear wheel, which was 2 1/2 feet on the hard surface. The speeding car caught the car he was driving just inside the rear fender. His car was completely demolished from the windshield back. He crawled out and found his married daughter was lying right at the wreckage. His wife was 8 feet south of the wreckage, and the baby 6 or 8 feet south of where his wife was lying. He then began to search for Evelyn, the deceased, and found her 50 feet south of the wreckage. "Picked her up, found she was dead, horribly mangled, totally decapitated — face was crushed in. She was broken to pieces." Laid her down and gave attention to the others and returned to the dead girl. A young man, James Miller, was standing there. "While we were standing there, and while waiting for the undertaker to come and take the body, Leonard, the defendant, walked up, put his hand on my shoulder and gave me a gentle shove as if to attract my attention, and with a drunken leer, thick tongue, said: `And you say I killed your daughter?' I said, `The man who was driving that car killed my girl.' He said, `I was driving the car and I didn't kill your girl.' I said, `I repeat, the man who was driving that car killed my girl.' He said, `I was driving the car and I didn't kill your girl.' I said, `Isn't there an officer in the crowd?' He said, `You are a hell of a preacher — talk like that.' Mr. Chapman pushed his way through the crowd and said, `Yes, I am here.' I said, `Take charge of this man.' He led him away." He stated in his opinion the car that struck his car was coming at not less than 60 miles an hour and more at the highest figure — more like an airplane than an automobile. "The car never swerved, no squeak in the brake, never slackened the speed nor swerved from me or attempted to dodge me. Don't know how wide Highway 15 is. I smelled whiskey very strong when defendant walked up in my face. He made no other remarks except what I have stated. I could hear the car that struck me pounding as it passed on by, then heard it turn over. Saw the car later in the field, off the highway to the right, 35 or 40 feet from the highway, and about 160 feet from where it struck my car. The automobile I observed approaching me as I made the left turn never reached me, nor anyways near me."
I. T. Chapman, a deputy sheriff, who lived nearby, was at his home; heard a speeding car pass by and the crash. Got to the wreck in five minutes. "Just as I got there, Mr. Leonard came up and made some *Page 245 
remark to Mr. Gentry; didn't understand what he said; heard Gentry ask if there was an officer there, and about that time I crossed over; saw he was drunk. Asked Leonard whose car that was. Saw him coming from the direction of that car that was lying out in the field, and he said, `That is my car.' I said, `Who was driving that car?' He said, `I was driving it.' I said, `You consider yourself under arrest.' We got out in the highway; told him he ought to be ashamed of himself. Heard him use that curse word at Preacher Gentry. He said, `I don't give a damn,' or something; I couldn't repeat it. He said, `Well, I didn't kill that girl.' I said, `If you were driving the car you killed the girl.' He said, `I was driving the car, but I don't know a damn thing about the girl being killed.' . . . He made the statement to me several times that night, and to several more people, that it was his car and he was driving it. . . . We got a bottle with a little bit of whiskey in it from under the car; right beside the car; wasn't under it. The car was leaning, and it was picked up on the edge of the car — a pint bottle. The defendant was drunk at the time I first saw him."
George Vogler, who was in the car with defendant, Leonard, testified that at the time of the collision that Ernest B. Leonard, the defendant, was driving the car.
C. W. Davis, who was also in the car with defendant, testified in part: "We came on this side of Salisbury, and Leonard looked like he was getting sort of wild-eyed, and he said `I am going to drive my automobile.' Said, `Let's me and you get in the front seat.' I said, `No, I am scared to ride with you; you are drinking.' He said, `I am going to drive it'; said `Stop, Vogler,' two or three miles this side of Salisbury. We stopped and all got out of the car. Leonard told Vogler to give him his keys. My wife spoke up and said, `Mr. Leonard, if I was you I wouldn't try to drive that car; you have been drinking; you are liable to have an accident.' He said, `It is my automobile, and I am going to drive it.' I said, `I know it's your car.' And he said, `You all are going to stay out of it if I don't drive it.' I said, `We can stay out of it; I can catch a train and me and my wife get back to Charlotte.' He said, `We all came up here together. I will drive it and drive careful.' I said, `No, let's don't get back.' He kept on talking in a friendly way and we decided to let him drive. Me and my wife got in the back seat and left Leonard at the steering wheel, Vogler beside him, and started back towards Charlotte. Leonard was driving. We drove down to where we could see the lights of Kannapolis. I had worked the night before. I threw my head over on my wife's shoulder and dozed off to sleep. The next thing I knew — it was like a flash — and the next thing I knew was next morning in the Concord Hospital at 5:30 or 6:00 o'clock; had me on the *Page 246 
operating table three hours and took 156 stitches in my head. Leonard was driving when I dozed off to sleep."
Mrs. C. W. Davis testified, in part: "I got in the back seat with my husband. Leonard took the steering wheel and Vogler got in the front seat and sat beside him. We were right on the edge of Salisbury coming back toward home. Mr. Leonard from then to the wreck. Mr. Leonard was driving when the wreck occurred. I asked him several times not to drive fast, and my husband asked him two or three times. I was scared because I knew he was driving, but his appearance did not show that he was drunk; he was drinking. When I asked him not to drive so fast, he would say that was his car, and he was going to drive it like he wanted to. My husband leant his head over on my shoulder and dozed off to sleep. I remember crossing the spur track that runs into the Cabarrus mill at the edge of Kannapolis. I should think we got a little faster after we passed there. When we crossed there the car kind of jumped. I should think he was driving fifty or sixty miles. He was driving so fast, I'd say we were fifteen feet from Mr. Gentry's car before I noticed it. Mr. Gentry was as far on the side of the street, and he was driving the way he was supposed to drive. I suppose he was driving fifteen or twenty miles an hour. When the cars hit it knocked me unconscious. I didn't know anything at all, but I came to myself one time — just realized a second. I was lying on the ground. I didn't know anything else at all. We got to the hospital, and I saw them carrying my husband to the steps. I was cut up; I was hurt in my chest and shoulders, and inwardly. I did not see Mr. Vogler drink any whiskey that day. He was not intoxicated."
R. O. Bolin testified in part: "I could see the Chrysler car from the time it passed until it hit the car, all but one time, it went around the Buick. I couldn't say how fast it was running, but at a tremendous rate of speed. I would say about 75 miles. I saw it when it hit the Chevrolet. I saw it pass another car after it passed me before it hit. It had already passed over the switch track at the mill when it passed me — jumped two or three feet when it hit that track. It did not slow down; it speeded up. . . . When I got to the car I didn't see any one around the car at all. . . . We looked in. Leonard's right foot over his left foot, and that peg off of the door; that rod that goes up and down is what was holding his foot. I mean the upright piece between the front and rear door. This fellow that came up behind us jerked this piece out after a little while. Leonard was groaning and hollering `I am dying.' After this fellow pulled this piece out he started around to the rear of the car and me and Glenn (Walker) stood there trying to get Leonard out, and as he came out he was cussing, and Mr. Walker asked *Page 247 
who was driving this car, and he said `I was driving it. I will drive anywhere any time' — something like that. We helped pull him out, and he walked on down the street. The car was standing right straight up on its top. I couldn't say just for sure which side, with reference to thesteering wheel, Leonard was on, but my best sight he was lying — partof him was under the front seat — and I think he was lying with hisfeet higher and his head right back angling toward the steering wheel. I couldn't say for sure, but he wasn't in the rear seat altogether, because Davis was back there. I helped Davis out."
Glenn Walker testified in part: "I got down there and some one hollered to go to the next car. I went to the Chrysler as quick as I could get there. There was one man there trying to get Leonard's legs. He grabbed his breeches leg and tore them, and Leonard was hollering, `I am dying!' And after he got that rod that holds the door Leonard started crawling out, and I left Leonard and went around on the other side, and me and Raymond (Bolin) pulled the man out of the Chrysler. I said, `Man, were you driving this car drunk?' And he brought out thick-tongued profanity, and said `Yes, I was driving this car, and will drive it anywhere any time I want to.' We started to turn the car back over this way, and Leonard said, `Do not turn it over this way; you will turn it over on the man.' We turned it north and Raymond (Bolin) and me picked Mr. Davis up and laid him on the bank and started toward Gentry, looking for somebody to bring him to Concord. I said, `Mr. Gentry, is there anybody hurt?' And he said `Yes, he has killed my girl.' Leonard came up there, and he threw his hands up and said, `You killed my daughter.' `The man that was driving that car killed my girl.'Leonard said he was driving the car, but to hell with damn girl. . . . Thecar was turned bottom upwards. Part of Leonard's body was under the frontseat, and his legs were sticking out the front door, if I am not badlymistaken."
James Miller testified in part: "I saw the Chrysler car pass just the other side of the first railroad crossing. I heard it before it got to me, and saw it pass. It was making between 65 and 75 miles an hour. . . . Found Evelyn lying in the ditch with her coat pulled up over her head, and I raised her head up out of the sand in the grass, and by that time Mr. Gentry came down there and said, `Is she dead?' And I said `Yes,' and he commenced hollering, `Don't let my wife come up here.' About that time Mr. Leonard came up and Mr. Gentry said, `Who was driving this car?' And Leonard said, `I was driving the car.' He said, `Well, you have killed my little girl.' Leonard said, `No, I haven't killed your little girl.' And Gentry said, `If you were driving that car, you are the man that killed my little girl.' By that time Mr. Chapman, an officer, *Page 248 
stepped up and Gentry told Chapman to take Leonard in charge. I didn't go down to the Chrysler car. I heard Leonard say, `You are a hell of a preacher.'"
Elton Morgan testified: "Was at the corner of Cabarrus Mill on night of 12 May; saw a Chrysler car pass. I guess it was going about 75 miles an hour. I heard the crash when it ran into the Chevrolet. . . . I was about 200 yards from Mulberry Street."
Roy Young testified in part: "I saw the Chrysler car before the wreck. I was in an automobile about fifty yards from the wreck coming toward Concord. The Chrysler car passed me. I wouldn't think it was running under sixty miles an hour."
C. E. Nussman testified in part: "I was in the jail when they brought Leonard in. He was put in jail. I asked him who was driving the car, and he said it was his car and he was driving it."
J. E. Durham testified in part: "Leonard was walking up and down the walk in front of his car, and using an oath. Some one asked who was driving the car, and he spoke up and said, `I was driving the car; it was my car and I was driving it; it was making seventy miles an hour; if it would have made more, I would have been making that.'"
The defendant in his brief in part contended, and his testimony and some of his evidence sustained the contention: "That at the time of the collision the occupants of the Chrysler automobile were E. B. Leonard, George Vogler, C. W. Davis and Mrs. C. W. Davis. As to who was operating the Chrysler automobile owned by defendant, E. B. Leonard, at the time of the collision, or if a person other than E. B. Leonard himself was operating the car, whether said person was doing so by the consent and approval of defendant, E. B. Leonard, there is a sharp dispute and in fact the whole case would seem to hinge upon this fact. The State contends that Leonard himself was driving the car at the time of the collision, but produced no direct evidence of the fact except alleged statements made by the defendant himself immediately following the wreck, when the testimony of both the State and the defendant shows clearly that he was not in a mental condition to comprehend what he was saying or the meaning of any statements he was making, and further shows that he did not comprehend what he was saying and which statements were consistently denied by the defendant when he came to his senses and regained his mental balance; and, second, the statements of the other occupants of the Chrysler automobile, one of whom testified that he had been drinking liquor at the time; and the other two obviously being interested in fixing the responsibility upon the defendant to save themselves, besides one admitting on cross-examination that he had manufactured and drank home-brew; was at the time under indictment *Page 249 
for this offense; and the other being the wife of one of the occupants of the automobile and interested with him in the manufacture of home-brew according to her own testimony. On the other hand, the defendant, E. B. Leonard, testified that he was not driving the car at the time of the collision, and in fact could not have been from his condition, and not only that, but that none of the occupants of the car were driving it with his consent and approval. . . . That at the solicitation and urgent request of Mrs. Davis and Vogler he consented for Vogler to drive his car for a ride around the city of Charlotte." That he got in the back seat and Vogler took them in a northerly direction from Charlotte. "That Leonard began to demand his car and that they take him back to Charlotte; that they promised to take him back to Charlotte, but Vogler refused to give him the car, and continued to drive it against the defendant's will and express orders, promising, however, to take Leonard back to Charlotte; that after riding some distance and realizing that Vogler was not taking him back to Charlotte he (defendant) became insistent that Vogler deliver possession of his car to him and threatened to have the whole party arrested. That thereupon Vogler stopped the car, got out of it and assaulted the defendant, Leonard, severely, knocked him in the back seat of the car with Davis, and that Vogler continued to drive the car; that the defendant never regained consciousness until after the wreck had occurred and he had been placed in jail; that when he did regain consciousness and was told of the wreck and the result, he demanded of the officer that Vogler be arrested as the driver of the car; that he, the defendant, was in the back seat of the car at the time of the collision and it was impossible for him in his then condition to have been operating the automobile or to have been directing its operation, and that Vogler was driving the car against the express consent of the defendant and only because he had secured the possession of it by the assault of the defendant; and as to the position of Leonard in the automobile at the time of the collision his testimony is supported by all the natural evidence in the case. . . . That Leonard and Davis were in the back part of the car and that Leonard was wedged and caught by his leg between the upright piece which runs up to the rear of the front seat and the back part of the car. It would have been almost a physical impossibility for the collision to have thrown Vogler and Mrs. Davis from the rear seat into the front seat, and at the time to have thrown Davis and the defendant, Leonard, from the front seat and under the steering wheel into the rear seat, down on the floor between the seats and to have wedged Leonard in, in the way and manner described by the witnesses." *Page 250 
Defendant introduced numerous witnesses who testified that his general reputation was good.
The jury returned a verdict of guilty of manslaughter. "The judgment of the court is that the defendant be confined in the State's prison for a period of not less than ten, nor more than fifteen years, and assigned to such labor as he is capable of performing by reason of his physical condition."
The defendant made numerous exceptions and assignments of error. The material ones and other necessary facts will be considered in the opinion.
We have set forth the facts on the part of the State and the facts to exculpate himself as stated by defendant in his contentions, perhaps more fully than was necessary; but, as we view the action, it resolved itself into purely a question of fact for the jury to determine from the evidence.
The jurisdiction of this Court in an action of this kind is, "To review, upon appeal, any decision of the courts below upon any matter of law or legal inference." Const. of N.C. part Art. IV, sec. 8.
We will consider the exceptions and assignments of error made by defendant. The witness Gentry had in his testimony stated who were with him in the car he was driving; testified that the car that struck his car cameon them at a tremendous rate of speed; described the wreckage to his car and the parties thrown out from the compact. He stated, "My wife and other daughter, Mrs. Baker, were in the car at the time the machine was struck." He was then asked: "Q. You may state whether or not they were injured by the same compact that killed your daughter, Evelyn." The objection of defendant was overruled and the witness answered: "They were injured at the same time." We think the evidence relevant and competent as tending to show the speed of defendant's car. The case of S. v. Beam, 184 N.C. p. 730, cited by defendant, is not applicable to the facts here.
The witness I. T. Chapman, who lived on State Highway No. 15, about 250 or 300 yards from the intersection of Mulberry Street, was at home and heard the crash of two cars, and just before heard a speeding car pass his house going in the direction where the collision occurred. It took him about five minutes — ran most of the way — to get to the wreck. He was asked the following question, which was excepted to: *Page 251 
"Q. You may state about how fast, in your opinion, if you have an opinion satisfactory to yourself, this automobile that you heard pass your house just before the wreck was running at the time it passed your house?" (Provided the jury find from the evidence that this is the same car that caused the wreck.) Defendant objected on the ground the witness says he was in the house behind closed doors; didn't see the car and don't know whose car it was and never saw the car. A. "I am quite sure the car was not running under sixty miles an hour that I heard pass the house." Motion to strike out. (By the court): "Admitted with the qualification heretofore given. It must be found, of course, that this is the car that caused the wreck, otherwise it would not be material." This exception cannot be sustained. If error, it was harmless. Witness after witness testified for the State that they saw the defendant's car along the route, and it was going sixty miles and more an hour. Elton Morgan, who was at the corner of Cabarrus Mill about 200 yards from where the cars crashed, about 50 to 100 yards from where Chapman heard it, said it was going 75 miles an hour. He put it nearer the collision as going 15 miles an hour more than Chapman. Gentry stated not less than 60 miles an hour when it struck his car, "morelike an airplane than an automobile."
Exception was taken to the testimony of the witness, J. E. Durham, as follows: "A car passed me." Q. "What direction was it (the car) going?" (The court): "Unless he connects it with this car, it would not be competent." A. "I was coming down the highway at the Rowan County line and Chrysler passed me at an unusual rate of speed. I got clean down out of the road when he went by me. It was a sedan. I kept on going down the highway, same direction the Chrysler was going, until I got down to the wreck." Q. "Was the Chrysler car in the wreck a similar car to the one that passed you up on the highway?" A. "It was a Chrysler sedan in the wreck." (The court): "That is a circumstance." "The car that passed me was making about 60 or 65 miles an hour. That was about three-fourths of a mile from the place of the wreck." We think this evidence clearly competent as a circumstance. In fact, all the positive evidence was to the effect that all along the route just before the compact the car defendant was in was going 60 miles an hour and more. These exceptions cannot be sustained.
Exception is taken to the charge: "Now, to start with, the law presumes the defendant is innocent, and before you can convict him of any offense, the burden is upon the State to satisfy you from the evidence beyond a reasonable doubt of his guilt." The ground of the exception is that the court below should have said from all the evidence, instead of from theevidence. The alleged distinction is without a difference. The *Page 252 
humane judge who tried this action in the court below charged the jury,"Now, to start with, the law presumes the defendant is innocent." This the court was not bound to give, at least without a prayer for instruction. S.v. Boswell, 194 N.C. 260.
The court fully defined reasonable doubt. "A reasonable doubt has been variously defined. It is sometimes said it means that you must be satisfied to a moral certainty of his guilt from the evidence, or that you must be fully satisfied. A reasonable doubt is not defined in law as any set formula. It is sometimes defined as meaning `fully satisfied or satisfied to a moral certainty.' It may also be said to mean that the jury ought not to convict unless, after a consideration of all the evidence, with all the light derived from the argument of counsel and the instruction of the court, their minds are involuntarily led to the conclusion of guilt." It will be noted that the court below charged precisely what defendant complained it did not charge, after a consideration of all the evidence;
and went further: all the light derived from the argument of counsel. Fairin the extreme to defendant.
Exceptions 9, 10 and 11 were to portions of his Honor's charge upon murder in the second degree. These exceptions have been eliminated by the verdict of the jury, who convicted the defendant of manslaughter only.
In S. v. Cox, 153 N.C. p. 638, the defendant was convicted of manslaughter. The court said, at p. 644: "Exceptions 20 and 21 relate only to the question of malice, and as the jury has found the prisoner guilty only of manslaughter, they have become immaterial." S. v. Worley, 141 N.C. at p. 768.
Exception 12. The court below charged the jury: "Now you see the fight hinges on this question of guilt or innocence, whether murder in the second degree or manslaughter, which I will reach later, hinges largely upon the question as to whether or not you find that Leonard was driving the car or Vogler was driving the car, or somebody else, first; and, second, as to whether or not if Leonard was not driving the car, the car was being driven under his direction and under his control. If you find that the car was not being driven under his direction and under his control, then, of course, you could not find him guilty of any offense, and unless the State satisfies you from the evidence beyond a reasonable doubt that the car was driven by Leonard or was driven by somebody under the direction or control of Leonard, you could not find him guilty of any offense." This portion of the charge in which the court below submitted to the jury the defendant's theory that the car was not being driven by him or by any one else under his control. The court tells the jury expressly that unless the State satisfied *Page 253 
them from the evidence beyond a reasonable doubt that the car was driven by Leonard or was driven by somebody under his control, they must not find him guilty of any offense. We can conceive of no reason why this was not a proper charge. It amounts simply to telling the jury that if they believed the defendant's account of the transaction or had a reasonable doubt as to the State's account of the transaction, they must acquit the defendant.
Exception No. 13. What the court said in full is given, not the excerpt objected to. The part objected to by defendant is in parentheses: "Now the State contends that at any rate, it was an unlawful killing; that this young woman was killed unlawfully, and the State contends that Leonard was the man that did the killing (and if you do not find that he did it through malice, as heretofore defined, implied malice, that you ought to find that he did it unlawfully; that if it was not that dangerous conduct and reckless and wanton conduct that evinced depravity of mind and disregard for human life, that it was that degree of negligence and that degree of misconduct that brought about the death of the deceased and was the direct result of this gross negligence of the defendant to such an extent that he was the cause of her death, and that it was an unlawful death without any mitigating circumstances or excuse, and that therefore you ought to find that he is guilty of manslaughter)." This was a contention. S. v. Reagan, 185 N.C. at p. 713; S. v. Sinodis, 189 N.C. at p. 571.
The court had theretofore defined manslaughter: "Manslaughter is the unlawful killing of a human being without malice and without any just cause or reasonable excuse. . . . Now, we come to the definition again to manslaughter: Manslaughter is the unlawful and wilful killing of another without malice, express or implied, and without legal justification or excuse, and under given conditions this crime may be established, though the killing be unintentional. When one unlawfully kills as a result of anger suddenly aroused by provocation which the law deems adequate, and the killing is done before sufficient time has elapsed, with passion so aroused to subside and reason to resume her sway, in such instance the anger so aroused is held to displace malice and to reduce the unlawful homicide to the grade of manslaughter. Thus, if two persons fight upon sudden quarrel, and during the progress of the fight one slays his adversary, slays in anger aroused by the combat, this ordinarily will be manslaughter." If defendant desired a fuller and more specific definition of manslaughter, he should have asked for it by proper prayer for instruction. Davis v. Long, 189 N.C. at p. 137. The exception cannot be sustained.
The defendant in his brief says: "The crucial point in this case, and the one upon which it largely depends, under the State's theory of the *Page 254 
case, and the evidence, is whether the defendant was driving the car himself. There is no evidence nor contention that any one else was driving the car by his direction and authority, and the State hangs its whole case upon its ability to prove that the defendant was himself driving the car at the time of the wreck, in person. We respectfully submit that there was not sufficient evidence on this point to warrant a conviction. When defendant renews his motion to dismiss as of nonsuit at the close of all the evidence, then this second motion must be considered in the light of not merely the evidence which was introduced by the State, but of all the evidence offered at the trial. S. v. Reagan, 185 N.C. 710."
This was defendant's exception under C. S., 4643 (civil actions, 567), the refusal of the court below, upon defendant's motion for judgment as in case of nonsuit at the conclusion of the State's evidence, and at the conclusion of all the evidence. The principle contended for in defendant's brief is correct law, but we cannot understand its application in the present action.
All the parties in defendant's car, except defendant, viz., George Vogler, C. W. Davis and Mrs. C. W. Davis, testified that defendant was driving the car. C. W. Davis to the effect that defendant was driving when he could see the lights of Kannapolis, and then he dozed off to sleep, and the next thing he knew "it was like a flash, and the next thing I knew was the next morning in the Concord hospital." Numerous witnesses testified that defendant admitted he was driving the car when the wreck occurred. This was a question of fact this Court has nothing to do with, as heretofore stated. The principle of law in actions of this kind is well stated in S. v. Rountree, 181 N.C. 535; S. v. Trott, 190 N.C. 674.
In the Rountree case, supra, at p. 538, it is said: "The degree of negligence necessary to be shown on an indictment for manslaughter, where an unintentional killing is established, is such recklessness or carelessness as is incompatible with a proper regard for human life. S. v.Gash, 177 N.C. 595; S. v. McIver, 175 N.C. 761; S. v. Tankersley,172 N.C. 955."
The jury has found that defendant drove the car on State Highway No. 15 that killed the little girl, Evelyn Gentry, some 14 years old. The State's evidence indicated that defendant was under the influence of intoxicating liquor and driving his car at a tremendous rate of speed. When it struck the railroad switch crossing in Kannapolis shortly before the compact with the car the little girl was riding in, defendant's car jumped two or three feet. It was coming like an airplane, 60 to 75 miles an hour. It is undisputed on the record that Rev. C. K. Gentry, father of the little girl, was returning from religious services with his wife, daughter, Mrs. Baker, his grandchild and little Evelyn, who was *Page 255 
killed. He was driving carefully. The compact threw Evelyn 50 feet south of the wreckage, horribly mangled, totally decapitated, broken to pieces. While the dead girl was on the ground and her father standing there, defendant walked up "and with a drunken leer, thick tongue" had the conversation narrated in the testimony, and admitted he was driving the car, and finished by saying to the dead girl's father, "You are a hell of a preacher, talk like that." The patience of the preacher, under such trying circumstances, is to be commended.
The State's evidence fully warranted the conviction of defendant for manslaughter or more. On the whole record the court below gave defendant everything he was entitled to in law.
The record discloses a fearful tragedy from the use of intoxicating liquor, not only the death of the little girl, but the injury and scars that those in the wreckage will carry to their graves. Punishment has come to the defendant and misfortune and grief to those near him. Surely the wise man was never wiser than when he said of intoxicating liquor: "At the last it biteth like a serpent and stingeth like an adder."
For the reasons given, we find in law
No error.