Indictment for murder. The defendant was convicted of murder in the first degree and sentenced to death. From the judgment pronounced, he appealed.
The defendant offered no evidence and the case was tried upon that introduced by the State. This evidence tends to prove these facts:
The defendant was the husband of Lula Shelton. It is evident that they lived unhappily together. About two weeks prior to Christmas, 1912, the wife refused to live with the defendant any longer on account of his conduct, and she went to the home of her mother.
On Christmas Eve defendant went there and pointed a pistol at his wife and told her he would kill her if she did not live with him. He *Page 412 
then asked for his overcoat, and as he was about to leave, said to his wife's sister that he intended to kill his wife when she put her foot off the lot, and instructed her to tell his wife.
There is no evidence that he was so drunk on this occasion that he was irresponsible and did not know what he did and said.
About ten days before the homicide defendant told one Adkins he was going to kill his wife because she would not live with him, and he told at different times numerous other witnesses that he was going to kill his wife and the whole Trent family, being the family of his wife; that she had sworn to lies on him.
On 24 March, 1913, the wife was at the home of Mrs. Jennie Black in Reidsville. She was sitting in a room with several other people, when the defendant came in, walked up to his wife and started to put his hand in his pocket. His wife threw up both hands and started towards him, when he pulled out his pistol and shot her twice. The wife fell and died in seven or eight minutes.
A sister of the defendant then pushed him towards the door (515) and he went out into the yard, where he was arrested by two men, and as he was being carried away, he said: "I did what I said I was going to do — what I wanted to do. I put three balls in her, and I will go to the electric chair for it." He repeated this statement afterwards to other witnesses.
The exceptions to the evidence are without merit and are not of sufficient importance to require discussion.
The third exception relates to a remark of the judge. Counsel for the defense in addressing the court as to the incompetency of a conversation between the defendant and his wife, maintained that this kind of evidence was analogous to that prohibited by section 1631 of the Revisal; that if the witness Effie Trent did not state the truth about the conversation, her sister Lula Shelton being dead, there would be no one to deny it.
The judge remarked from the bench and in the hearing of the jury that the defendant could deny it; and to this remark the defendant excepts. The exception ought not to be sustained. Section 1631 has no application whatever to criminal cases. The conversation between the husband and the wife in which he threatened to kill her was entirely competent. The judge was simply replying to an unsound legal proposition that was being argued by the counsel for the defendant, and his remarks were in no way improper.
He subsequently, in his charge, warned the jury that they could not consider to the prejudice of the defendant the fact that he did not go upon the stand and testify as a witness. The exception chiefly relied on by the defendant is to the following extract from the charge of the court: *Page 413 
"If you find from the evidence beyond a reasonable doubt that the defendant, previous to the time he killed his wife, if you find he did kill her, was so intoxicated as not to be able to form a specific intent and to deliberate and premeditate, but was not insane by reason of it, as before explained to you, so as not to know the difference between right and wrong, and with a deadly weapon slew his wife with malice, you will find him guilty of murder in the second degree."
His Honor erred in using the words "beyond a reasonable (516) doubt" in that connection, but we do not think the error was very material and of sufficient important to warrant another trial.
The burden of proof is on the State at all times to prove the willful, deliberate, and premeditated killing, and his Honor so instructed the jury very clearly, but where the defendant claims that at the time of and immediately before the homicide he had been rendered incapable of forming a deliberate and premeditated purpose to kill by reason of drunkenness, the burden is on him to prove it, not beyond a reasonable doubt, but to the satisfaction of the jury.
The charge of the court upon the burden of proof and the doctrine of reasonable doubt is so full and clear that it would scarcely have been misunderstood.
His Honor said: "This defendant not only pleads not guilty to this charge against him, but when he comes into this court and is put upon his trial, is presumed to be innocent of any crime. This is no mere idle presumption to be disregarded at will, but is a fundamental principle of the law of this State, and applies in this case as in all other trials for violation of the criminal laws. And a defendant is covered with this presumption of innocence until the State by competent evidence rebuts such presumption, and before you can return a verdict of guilty against this defendant of any degree of crime, the State must have satisfied you of his guilt, and that to the exclusion of every reasonable doubt. That is the burden that is upon the State in this case, I repeat, to prove the guilt of this defendant beyond a reasonable doubt, before you can convict him of any degree of homicide."
We are further of the opinion that the charge was harmless error, for the reason that there is no sufficient evidence in the record that at the time of the homicide he was in such a mental condition, brought about by excessive drinking, as to render him incapable of committing deliberate and premeditated murder.
S. v. Murphey is a leading case on this subject, and the question is fully discussed by Mr. Justice Hoke.
In that case it is stated that there was evidence that at the time of the killing "the mind of the prisoner was so affected, at (517) *Page 414 the time, by voluntary drunkenness that he was incapable of committing murder in the first degree."
In the opinion the learned judge says: "It is very generally understood that voluntary drunkenness is no legal excuse for crime, and the position has been held controlling in many causes in this State and on indictments for homicide. The principle, however, is not allowed to prevail where, in addition to the over act, it is required that a definite specific intent be established as an essential feature of the crime. In Clark's Criminal Law, p. 72, this limitation on the more general principle is thus succinctly stated: `Where a specific intent is essential to constitute crime, the fact of intoxication may negative its existence.'
"Accordingly, since the statute dividing the crime of murder into two degrees, and in cases where it becomes necessary, in order to convict an offender of murder in the first degree, to establish that the killing was deliberate and premeditated, these terms contain, as an essential element of the crime of murder, a purpose to kill previously formed after weighing the matter (S. v. Banks, 143 N.C. 658; S. v. Dowden, 118 N.C. 1148), a mental process embodying a specific definite intent; and if it is shown that an offender, charged with such crime, is so drunk that he is utterly
unable to form or entertain this essential purpose, he should not be convicted of the higher offense.
"It is said in some of the cases, and the statement has our unqualified approval, that the doctrine in question should be applied with great caution. It does not exist in reference to murder in the second degree, nor as to manslaughter. It has been excluded in well considered decisions where the facts show that the purpose to kill was deliberately formed when sober, though it was executed when drunk, a position presented inS. v. Kale, 124 N.C. 816, and approved and recognized in Arzmanv. Indiana, 123 Ind. 346, and it does not avail from the fact that an offender is, at the time, under the influence of intoxicants, unless, as hereinbefore stated, his mind is so affected that he is (518) unable to form or entertain the specified purpose referred to."
Wharton sums up the matter by saying that "a person who commits a crime while so drunk as to be incapable of forming a deliberate and premeditated design to kill is not guilty of murder in the first degree. The influence of intoxicants upon the question of the existence of premeditation, however, depends upon its degree and its effect on the mind and passions." Homicide (3 Ed.), p. 811.
All the authorities agree that to make such defense available the evidence must show that at the time of the killing the prisoner's mind and reason were so completely intoxicated and overthrown as to render him utterly incapable of forming a deliberate and premeditated purpose to kill. *Page 415 
As the doctrine is one that is dangerous in its application, it is allowed only in very clear cases; and where the evidence shows that the purpose to kill was deliberately and premeditatedly formed when sober, the imbibing of intoxicants to whatever extent in order to carry out the design will not avail as a defense.
In the rulings of the court and the charge to the jury the defendant has had the full benefit of his plea of insanity, which was very properly repudiated by the jury, as there is as little evidence to support that as there is the plea that his mind and reason at the time he slew his wife were so completely dethroned by intoxication that he could not be guilty of a willful, deliberate, and premeditated murder.
The evidence that the defendant formed and expressed to several different persons at various times, extending over a period of two months, the settled purpose to kill his wife is overwhelming.
On Christmas Eve, 1912, he sought his wife, pointed a pistol in her face, and told her he would kill her if she did not live with him. There is no evidence that on these occasions he was drunk and did not know what he was doing.
None of the witnesses who were present at the homicide say that (519) defendant was drunk, and one of the witnesses, Moricle, said he had seen defendant under influence of whiskey, but on this occasion "he looked like a sober man."
Witness Adkins testifies to a conversation ten days before the homicide, in which defendant told him he intended to kill his wife because she would not live with him. "At the time of the conversation I could not say whether Shelton was drunk or not. He had had a drink. He drank right much when he was not at work. He was not at work at this time. It had not been long since he quit work. I saw him about once a week, and he was always drinking."
Witness Tally testified that defendant told him that he intended to kill his wife; that he saw him afternoon of the homicide, and "his condition seemed to be all right."
Witness further said: "I have known Shelton eight or ten years. Sometimes he was drinking, sometimes he was not. You could call him drunk, but he was going. Sometimes for two or three days he would drink, sometimes he would not. He seemed to be sober on the day of the homicide."
Witness Walker testified that he had conversation with defendant the morning of the homicide. "I am not able to tell what his condition was." Witness further stated that defendant before that had come to the store drunk; he generally came in drinking, and witness asked his brother to keep him out.
Witness further testified that "the defendant a few hours before the *Page 416 
killing had asked witness, `If you were going to kill yourself, where would you shoot?' I told him I had never thought of such a foolish thing. A few hours before the killing, I had told my wife that I believed Shelton was crazy."
Witness Michael testifies to hearing defendant say on the evening of the homicide that he had done what he aimed to do; and on the subject of habits, he said:
"I have known Walter Shelton four years. I live in the same neighborhood with him. I have heard of his drinking habits for the last two years. His general reputation in the neighborhood is that of a drinking man. On the evening of the killing he was as sober as I usually saw him."
Witness Myrick testifies: "I have known Walter Shelton about (520) fifteen years and lived in Reidsville practically all the time Walter has. He drank a good deal. Sometimes he would act kinder foolish. I have heard about his knocking a fellow in the face with a beer bottle. The evening of the homicide he looked like he was drunk."
Thomas Lebass testified as follows: "During Christmas week Shelton made a statement to me. He said he had a wife and was going to kill her, and I says, `Walter, do you know you are going to get in trouble? There will be another Allen case.' He said he was going to kill her. I asked him what for. He said because she would not live with him. I asked him if she was a nice lady. Said yes, she was a nice lady, and give me that to understand right then. I told him to go home, he was drunk. Said he was not drunk, and he was not going home, either. I saw him on the day of the homicide, about 75 or 100 yards, before and after. He was going up the opposite side from where I was standing, with his right hand in his right coat pocket. I just noticed him going along. I did not pay much more attention to him. He was walking right peartly, as usual, and I talked there about three minutes, when Miss Effie Trent came running down the street and said her sister had been shot.
"I ran to the house as soon as I could get there, and found her on the bed, shot and dying. She lived about six or eight minutes after I got in the house. I saw Shelton against the front fence along the street. I took hold of him one time when he was about to get away.
"He was drinking some, not drunk. He stayed a little intoxicated most of the time. I don't say the 10th or 11th notch. That would be pretty good speed."
This is the entire evidence relating to the condition of the defendant. In our opinion it fails to show that at the time of the homicide the defendant was so drunk as, in the language of Justice Hoke, "to render *Page 417 
him utterly incapable of forming a deliberate and premeditated purpose to kill."
It tends rather to prove that the defendant had been for two months deliberating and premeditating the murder of his wife, (521) and that if he was drinking at all on the day of the homicide, it was to assist him to put his deadly purpose into execution.
We have given this case a very careful examination, and are constrained to conclude that there is
No error.
Cited: S. v. English, ante, 512.