STATE v. WILFONG TROTT.

(Filed 9 December, 1925.)

**1. Evidence—Motion to Dismiss—Nonsuit.**

Defendant's motion to dismiss in a criminal action for insufficient evidence to convict, will be denied if there is any phase thereof which tends to prove his guilt.

**2. Homicide—Murder—Drunkenness—Criminal Law.**

Voluntary drunkenness which produces irresponsibility will not ordinarily excuse liability for a criminal offense committed under the influence of intoxication thus produced.

**3. Same—Automobiles—Collisions—Negligence.**

Where one in charge and control of an automobile becomes drunk, and before losing his senses puts another in charge of the car to operate it, and remains in the automobile on the back seat and becomes mentally

incapacitated, and the one operating the car had likewise been drinking with the defendant, and by his reckless driving in violation of our statute, runs into another automobile and causes the death of a person for whose death the defendant is on trial for murder in the second degree or manslaughter, a prayer that there is no evidence of murder in the second degree will be denied.

**4. Same—Malice.**

The malice necessary for a conviction of murder in the second degree, may be inferred or implied from a reckless or wanton act which imports danger to another, evidencing mental depravity and disregard of human life.

**5. Same—Intent.**

The intent to kill may be presumed from the facts and circumstances attending the taking of a human life, with which the defendant is charged.

APPEAL by defendant from *Stack, J.*, at a Special Term of the Superior Court of CATAWBA County, held in April, 1925.

The defendant and one Robert Michael were jointly indicted for the murder of Evelyn Rowe. When the case was called for trial the solicitor announced that the State would prosecute the defendants only for murder in the second degree or for manslaughter. Both were convicted of murder in the second degree. Michael did not appeal; but from the judgment pronounced against himself the defendant appealed to this Court.

The facts may be reduced to a summary statement. On 9 February, 1925, about noon, Lewis Yoder, Fred Yount, Robert Michael, and the defendant left Newton in a seven passenger Hudson car bound for a clubhouse at Lookout Dam on Catawba River. About 1 o'clock they bought a pint of liquor and drank a part of it. Arriving at the club house about 2 or 2:30 they bought and ate eggs, tomatoes, sausage, and pork and beans; and at four o'clock they started back by another road in the direction of Newton. At 4:30 they bought a quart of liquor, one of the witnesses being uncertain "whether they drank it up or not." Two miles from Conover the car slid into a bottom and stuck in the mud, and an hour afterwards a team of horses pulled it out. The party then went to Conover and stopped at a filling station; it was then dark, about seven o'clock. At 7:30 or 7:45 they reached the cotton-mill office in North Newton, and Fred Yount walked home; but having bought another quart of liquor the defendant there took several more drinks and Michael and Yoder each at least one. Up to this time the defendant had driven the car. He said he did not know when he left the cotton mill or who had charge of the car when it was driven away, and Yoder said the defendant was too drunk to drive and he would not ride with him. But Michael testified: "After we came out (of the office) Mr.

Yoder was sitting in the front seat and I got in the back and he said, Wilfong Trott asked me to drive. Mr. Trott told me to drive, said he was tired, had been driving all day. Yes, I brought Mr. Yoder home. That was the first time I had done any driving that day. Mr. Yoder sat in the front seat with me as I came down town. Mr. Trott got in the back seat and we went to the hot-dog stand. I took Mr. Yoder home before I went to the Wiener stand. When I went to Mr. Warlick's garage I got out. Before I took Mr. Yoder home we went back up the street to look for Mr. Yoder's car, but we didn't find his car and I took him on home. Then the only two persons remaining in the car were me and Mr. Trott, and that was the situation when we went to Mr. Warlick's garage. I stayed at the garage I suppose ten or fifteen minutes. While I was there I saw Mr. Jones, the policeman. Something was said about a policeman being around there. Mr. Robert Huffman and Wade Gilbert said when Mr. Jones passed, 'There went K. C. Jones,' and he drove out and turned around and started back and Mr. Huffman and Mr. Gilbert said, 'You had better get away from here.' That was said in Mr. Trott's presence, and Mr. Trott said: 'Get on the wheel and get away.' I think Mr. Trott was sitting on the back seat. When that was said, I got in the car and went ahead." There was evidence of remarks made by the defendant twice after the car left the garage and before the collision.

W. A. Misenheimer owned the Hudson car, but the defendant had charge of it. He testified: "I did leave my car in Mr. Trott's hands,— left Mr. Trott in charge of my business when I went away. I left a seven-passenger Hudson car in his charge—Mr. Trott had managed my business and had this car four or five months before this tragedy."

While the defendant and Michael were at Warlick's garage, or about that time, Paul Yount and Joe Cline went in a Ford roadster up the street towards the depot and overtook nine girls who, having attended a meeting of the "Children of the Confederacy," were on their way home. The boys took six of the girls into the car, Evelyn Rowe (fifteen years of age) and Mildred Phillips standing on the left running board. Just before the girls got into the car the Hudson passed, without any lights, going in the same direction. The Ford then turned, and after going down the street and around the square, went back up Main Street. Near Ross Hewitt's residence the Hudson was seen coming back. The Ford with lamps lighted was then on the right side of the street, going towards the depot at the rate of ten or fifteen miles an hour, the two right wheels off the hard surface; and the Hudson came from the direction of the depot on the same side of the street, lights on, at the rate of fifty or sixty miles an hour, according to the State's evidence, and thirty or thirty-five according to the defendant's. It

struck the Ford carrying it twenty-five or thirty feet down the street, hurled Mildred Phillips twenty feet, injuring her severely, and Evelyn Rowe sixty feet to the south, causing her immediate death, and then ran on about a hundred yards, turned over, and threw Michael and the defendant into the street. Michael was driving the car at the request of the defendant.

The assignments of error appear in the opinion.

` *Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*
*Wilson Warlick and Self & Bagby for defendant.*

ADAMS, J. The defendant's motion to dismiss the action and his first prayer for instructions assail the evidence on the ground of its insufficiency to warrant a verdict of murder in the second degree or of manslaughter. It is earnestly argued that the fumes of drink had stupefied the defendant's brain to such a degree that when he left the cotton mill he was asleep; that he was incapable of forming an intelligent estimate of the speed with which the car was moving or of doing anything to prevent the collision; that in fact he knew nothing of Michael's alleged recklessness and should not be charged with the consequences of Michael's acts.

Several of our decisions are in support of the general rule (to which there may be exceptions, as suggested in the concurring opinion in *Williams v. R. R.,* 187 N. C., 355), that the negligence or wantonness of one who drives a car will not ordinarily be imputed to another occupant who neither owns the machine nor has any kind of control over the driver. *Duval v. R. R.,* 134 N. C., 331; *Baker v. R. R.,* 144, N. C., 36; *Hunt v. R. R.,* 170 N. C., 443; *Williams v. R. R., supra; Albritton v. Hill, ante,* 429. But the defendant is confronted with the question whether in view of the whole evidence the principle enunciated in these cases is available in his defense. His motion to dismiss the action essentially implies his denial of all guilt; and if there is any phase of the evidence which tends to establish his criminal responsibility for the death of the girl the motion must of course be denied.

That the defendant was intoxicated may be conceded; but his intoxication was voluntary, and voluntary drunkenness usually furnishes no ground of exemption from criminal responsibility. In Clark's Criminal Law it is said: "When a person voluntarily drinks and becomes intoxicated and while in such condition commits an act which would be a crime if he were sober, he is nevertheless responsible, the settled rule being that voluntary drunkenness is no excuse. A person may be so drunk when he commits an act that he is incapable, at the time, of

knowing what he is doing; but in case of voluntary intoxication a man is not the less responsible for the reasonable exercise of his understanding, memory, and will." C. 5, sec. 27. And in *S. v. John,* 30 N. C., 330: "All the writers on the criminal law from the most ancient to the most recent, so far as we are aware, declare that voluntary drunkenness will not excuse a crime committed by a man, otherwise sane, whilst acting under its influence." See, also, *S. v. Keath,* 83 N. C., 626; *S. v. Potts,* 100 N. C., 457; *S. v. Wilson,* 104 N. C., 868; *S. v. McDaniel,* 115 N. C., 807; *S. v. Murphy,* 157 N. C., 614; *S. v. Shelton,* 164 N. C., 513; *S. v. Foster,* 172 N. C., 960.

The defendant does not attack this doctrine, but admits it; he does not attempt to evade the fact or the legal significance of the fact that he was in the Hudson car; but he contends that he was utterly incapacitated and had nothing to do with its operation. There is evidence to this effect; but there is other evidence which tends to show that while under the influence of liquor, and "otherwise sane," he directed Michael, who also was intoxicated, to take charge of the car—"to get on the wheel and get away"; and that Michael obediently "got under the wheel," and soon thereafter, in breach of three separate statutes (C. S., 2614, 2617, 2618), and with reckless disregard of the public safety ran the car on one of the main streets, after dark, at the rate of fifty or sixty miles an hour, wrecking the roadster, killing the deceased, and imperiling the lives of six or eight others. That the defendant was not irresponsible (*S. v. Shelton, supra*), but guilty of a breach of the criminal law, and that the evidence was sufficient to justify such a finding, hardly admit of serious doubt. The motion to dismiss the action and the request to give the first prayer for instructions, were therefore properly denied.

It is next contended that Michael was not guilty of any higher degree of homicide than involuntary manslaughter; that in the commission of this offense there are no aiders or abetters; that the defendant cannot be charged with manslaughter or indeed with any offense unless it is shown that he had control of his mental faculties and operated or directed the operation of the car at the time it was driven from Warlick's garage or between the time of its departure and the moment of the collision; and that he did not direct and was not then capable of directing the removal or the operation of the car. This position he urged on the trial, not only by his second and third prayers for instructions, but by exceptions to certain parts of the charge, the substance of which is embraced in the following paragraph: "If Trott ceased to drive his car at Yount's mill and then and there fell asleep or became so drunk that he was incapable of knowing what took place thereafter up to the moment of the collision, then he would not be guilty of any offense, unless he turned the operation of the car over to Michael before he became in-

capable of knowing what he was doing. But, if Trott turned the operation of the car over to Michael, knowing that Michael was intoxicated, and after doing so, Trott fell asleep or became so dead drunk that he was incapable of knowing what he was doing, still he would be liable for his act which took place when he did know what he was doing and before becoming unconscious."

The defendant was not convicted of manslaughter, but of murder in the second degree. For this reason minute attention to the law of manslaughter is not necessary; if the conviction is upheld the case will be ended, and if it is not, a new trial will be awarded. We must therefore determine whether the verdict and judgment shall be sustained or whether the evidence shall be submitted to another jury.

Murder in the second degree, or murder at common law, is the unlawful killing of a human being with malice aforethought. Malice does not necessarily mean an actual intent to take human life; it may be inferential or implied, instead of positive, as when an act which imports danger to another is done so recklessly or wantonly as to manifest depravity of mind and disregard of human life. This principle was clearly stated in the charge; but in reference to its application the defendant's chief contention is this: there is not only an absence of actual malice, but no such evidence of recklessness, wantonness, or depravity as is necessary to supply the intent or to raise an inference of malice.

It is true that the use of a deadly weapon, as a gun, pistol, or dagger, is prima facie evidence of malice, and the fact of its intentional use imposes upon the accused the burden of showing circumstances in mitigation or excuse. *S. v. Fuller,* 114 N. C., 885; *S. v. Norwood,* 115 N. C., 789; *S. v. Brinkley,* 183 N. C., 720. But the principle applicable to the case at bar does not involve the exercise of a specific intent as in *S. v. Allen,* 186 N. C., 302, and *S. v. Williams,* 189 N. C., 616, but the existence of one which is general and implied; and voluntary drunkenness does not affect the presumption of a general criminal intent arising from homicide if the other attendant circumstances afford neither justification, excuse, nor mitigation. See cases cited above; 29 C. J., 1056, sec. 20. Furthermore, it has been held that where the act causing death is not only *malum in se* but also *malum prohibitum* the homicide is sufficient to warrant a finding of the implied malice which would make the causal act murder at common law. *Maxton v. State,* 187 N. W. (Wis.), 253; *Montgomery v. State,* 190 N. W., 105.

"A person driving a carriage happens to kill another: If he saw or had timely notice of the mischief likely to ensue, and yet wilfully drove on, it will be murder; for the presumption of malice arises from the doing of a dangerous act intentionally. There is the heart regardless of social duty." 1 East's Pleas of the Crown, 263.

Approving this doctrine *Huddy* says: "The act of a motorist may fall within the cases of murder in such a manner as to evince a depraved mind, as where one voluntarily becomes intoxicated while driving a car, and then drives on the streets of a city at a high rate of speed, heedless of pedestrians or of his acts. To make a case of murder against a motorist exceeding the speed limit, it should appear that such conduct was directly perilous to human life or that human life would probably be endangered thereby. Thus, if one in charge of a car so operated it where he saw people on the street and in danger, and if he so operated his car where he knew it to be probable that people were in the way, malice may be implied." Automobiles, 7 ed., 993, sec. 917. See, also, The Law of Automobiles by Berry, sec. 1758.

It would be idle to say that Michael's reckless driving was unintentional or that he did not know the speed of the car was excessive when the collision occurred. Indeed, it is not unreasonable to infer that he was conscious of a "malignant recklessness of the lives and safety of others" when for the last time he drove the car down the street. It is hardly less evident that the defendant a short time before commanded a speedy removal of the car to avoid arrest, and that although intoxicated he was not irresponsible. Over the car he had absolute control; he had procured or assisted in procuring the whiskey; and he was responsible at least in part for Michael's condition. After making Michael his chauffeur and ordering him "to get away" from the garage he cannot now disclaim responsibility for the operation of the car under circumstances from which may be implied the malice that distinguishes murder in the second degree from the lesser crime of manslaughter. *S. v. Lilliston*, 141 N. C., 857.

We have given attention to the exceptions relating to the admission and exclusion of evidence and find no reason for reversing the ruling of the court. The material questions are presented in the assignments of error which we have undertaken to review. We find

No error.