BARNHILL, J., dissenting.
ERVIN, J., concurring in dissent.
Criminal prosecution on indictment charging the defendant with the murder of his wife, Mattie Creech.
The record discloses that on 28 July, 1948, around the hour of midnight, the defendant shot and killed his wife with a double-barrel shotgun in the home of a neighbor, where she had gone and was staying temporarily as a result of a quarrel with the defendant on the 16th of the same month. The scene of the homicide was in the Brogden section of Johnston County about a quarter of a mile from the defendant's home.
The August Term of Johnston Superior Court convened on 16 August, 1948, and the grand jury returned a true bill against the defendant on the first day of the term. Arraignment was had and plea entered on the same day, and the defendant moved for a continuance on the ground that he had not had sufficient time to prepare his defense. Affidavits and *Page 665 
exhibits were submitted, and the solicitor agreed, upon request, to aid in the production of the witnesses for the defendant, or to admit the exhibits as their sworn testimony and the truth of the statements contained therein. The motion was thereupon overruled, a special venire was ordered, and the case was set for hearing on the following morning. Exception.
THE STATE'S EVIDENCE.
In assuming the burden of establishing the crime as charged, the prosecution offered evidence tending to show that Mrs. Elsie Mae Creech (with whom the defendant's wife was then staying temporarily) took the defendant's wife to Durham on Tuesday night, July 27, so that she might enter Duke Hospital for an examination on the following morning. This was done and they returned home late that evening. At about 11:00 p.m., the defendant appeared at the home of Elsie Mae Creech, and after being invited in with a cordial salutation, he stepped into the hall and said: "Elsie Mae, what did they find wrong with Mattie today?" He was informed that X-rays were taken and she would get the reports later. About that time the defendant's wife came up and he asked her the same question. Elsie Mae Creech then asked the defendant and his wife to go into the living room, which they did. She followed in a few minutes and the defendant remarked, "I have some whiskey out there in the car if you girls would like to have a drink." They both declined. He then said: "Well, I have got some peaches out there, would you like to have some of them?" Up to this point the defendant appeared to be normal and in possession of his normal faculties. After some conversation about the peaches, he stood up and said, "There is no use beating around the bush any longer," and looking at his wife he inquired, "Are you planning to go back home or not?" She replied that "she was not planning to"; whereupon he became angry, used some profanity, and said a lawyer would see her in the morning. He then left, got in his car, and drove off.
In about ten minutes the defendant returned with a shotgun, threatening to kill everybody in the house. Johnnie Grimes, who, with his family, lived in a part of the house, grappled with the defendant in the hall and tried to take the gun away from him, but was unable to do so. While this was taking place, the other occupants of the house went into an adjoining bedroom. All the lights in the house were on, except in this bedroom. Johnnie Grimes then jumped back through the door into the bedroom, and he, Elsie Mae and Mattie pushed against the door to keep the defendant from entering. After pushing the door four or five times, the defendant fired through the panel of the door and struck his wife who slumped down to the floor. The defendant then began to push the door a new, and Johnnie Grimes advised the others to flee for safety. This they did, hiding in the weeds outside and under the house. The defendant soon *Page 666 
came out and Elsie Mae Creech heard him say, "I especially wanted to kill Mattie and Elsie Mae." Pretty soon the defendant returned to the house, entered the room where his wife lay, took aim and shot the top of her head off. He then went out on the back porch, set the gun down in the corner, and called Johnnie Grimes to come and take him to the sheriff. In a few minutes the defendant's car was heard to start up, and go off in the direction of Smithfield.
Mary Edna Grimes, age 13, who had sought safety by hiding in the edge of the adjacent woods, saw the defendant get in his car. She says, "He reached towards the glove compartment, took out a bottle and turned it up to his head. . . . He must have taken more than one drink as he kept it up there and took it down and then got another. He drove off towards Smithfield."
Sometime between 12 and 1:00 a.m. the defendant appeared at the sheriff's office and gave himself up to Deputy Sheriff Lester Hales. After inquiring for the sheriff, the defendant said: "Well I just as well tell you: I blowed her damn brains out. . . . I killed Mattie. This damn Duke Hospital, I have stood it as long as I can and I blowed her damn brains out." The defendant turned over to the officer his pocketknife and $427 in money which he had on his person. He counted the money in the presence of the officer. His count was accurate. The jailer said the defendant "looked like a crazy man; drunk and crazy too." Cross-examination: "I did not hear him speak but once. He said, `I am as crazy as hell.'" The officers then went to make an investigation. They located the gun at the house; and on the front seat of the defendant's car they found a bottle with some whiskey in it. These were offered in evidence.
The prosecution offered Jack Gardner as a witness, who testified that the defendant came to his filling station between 9 and 10 o'clock on the evening of the homicide. He was there an hour or more, during which time he took two or three drinks. He said he had been to Pinehurst and had called his wife from there at Duke Hospital but the nurse would not let him speak to her. He remarked that "he wished she was dead; wished he could wake up in the morning and hear that she was dead, that would be the sweetest music he had ever heard." When he left the filling station, "he could walk all right; perfectly all right; and talked all right. He drove his car away." There was a basket of peaches and a double-barrel shotgun in the back of the defendant's car.
THE DEFENDANT'S EVIDENCE.
The defendant refrained from going on the witness stand, but offered evidence intended to satisfy the jury of his mental debility or insanity at the time of the homicide.
On Wednesday, July 21, the defendant took a motor trip to Valdosta, Ga. He picked up a young man in Lumberton, a hitch-hiker, and took *Page 667 
him along for company and to help with the driving. The defendant got very drunk on this trip. On his way back he spent two days and two nights in a hospital at Savannah, Ga. Dr. John G. Sharpley, of the Hospital, certified that when the defendant came there on the 22nd, he showed symptoms of "chronic alcoholism . . . and some mental confusion. . . . He was discharged on July 24th, his nervousness had ceased and he seemed to be in very excellent spirits. He showed no signs of mental aberration."
The defendant offered a number of witnesses who testified that he was "heavily under the influence" on the night preceding and during the day of the homicide. And further that the defendant and his wife got along all right, except when he was drinking; that drink was the cause of their several separations.
Millard Parrish and Mrs. Cassie Lee testified that they drove past the home of Elsie Mae Creech on the night of July 28, between 11:30 and 12 o'clock, and within a short distance their car flashed against an automobile which had "slid off the road and into the edge of the woods on the left side." They ran by, but stopped at the first side road to go back and render assistance. Before they could turn round and while looking for a flashlight, the defendant appeared on the right-hand side of their car and got in the front seat. He was wet and looked like he was drunk. He said he wanted to go to the sheriff's office; that he had killed his wife. Later he said he wanted to stop and tell his father and mother what had happened. Pretty soon, he slumped over as if he were dozing. When they reached the father's house, the defendant got out of the car and went up the steps and had a conversation with his father and mother. They then took the defendant to the sheriff's office.
On the next day, Dr. Watson Wharton saw the defendant, said he appeared to be having a "hang-over" from being drunk. He took a specimen of his blood at about 12:20 p.m. and sent it to Dr. Haywood Taylor at Duke University for examination and laboratory analysis. Dr. Wharton gave it as his opinion that "12 hours prior to my examination he was not in condition, by reason of drunkenness, to understand and weigh the nature and consequences of his acts."
Dr. Taylor testified that the specimen of blood "contained alcohol to the extent of .14 percent." He gave it as his opinion that if the specimen had been taken 12 or 13 hours earlier, it would have shown an alcoholic content of from .25 to .3 percent; and that a person with that percentage of alcoholic concentration "would not be capable of forming a deliberate and premeditated intent to kill and know the consequences of it."
Dr. J. F. Owen, a psychiatrist of Raleigh, testified that in consequence of a telephone call from one of defendant's counsel around 10 o'clock on the morning of July 29th, he went to Smithfield at about 3:00 p.m. that *Page 668 
day and saw the defendant for a couple of hours. He returned later on August 2nd and spent a half-hour with him. In all, he saw the defendant three times before the trial. He gave it as his opinion that "the defendant was not in a mental condition to think out before hand what he intended to do and to weigh and understand the nature and consequences of his acts on the night of July 28th."
Mr. and Mrs. J. Rufus Creech, father and mother of the defendant, testified that when the defendant came to tell them of the killing he was not himself, "he wasn't natural . . . he wasn't right. . . . The expression in his eyes was awful . . . just like a wild man. . . . He had a wild, crazy look. . . . He didn't even look like himself."
Verdict: Guilty of murder in the first degree.
Judgment: Death by asphyxiation.
The defendant appeals, assigning errors.
after stating the facts as above: We are here confronted with (1) the ruling on the motion for a continuance, (2) objections to admissions and exclusions of evidence, and (3) exceptions to the charge.
I. Motion for continuance: In support of the motion for a continuance, counsel for defendant submitted affidavits from Doctors, J. F. Owen and Watson Wharton, each affirming his unpreparedness to give expert testimony in the case without first conferring with Dr. Haywood Taylor, toxicologist at Duke University, to whom a specimen of defendant's blood had been sent for examination and laboratory analysis. It was made to appear that Dr. Taylor was then at Myrtle Beach, S.C., on vacation and was not expected to return before 7 September.
In addition, it was asserted that Dr. John G. Sharpley and his nurse, Mrs. Rebecca Weathers, who had attended the defendant at a hospital in Savannah, Ga., on 22 July, 1948, were material witnesses and could not be reached by subpoena, and that counsel had arranged to take their depositions on 21 August for use in the trial of the cause.
In reply, the solicitor stated that Dr. Haywood Taylor was then at nearby Myrtle Beach, and had advised defense counsel by letter that he would be available at any time, upon request. The solicitor further stated that he had procured a written statement from Dr. John G. Sharpley showing the defendant's condition when he was in the hospital at Savannah; that he would turn this statement over to counsel for defendant and allow them to offer it in evidence as the sworn testimony *Page 669 
of both Dr. Sharpley and his nurse, and that he would admit the facts therein stated to be true. It was also asserted that when counsel for defendant gave notice of their intention to take the depositions of these witnesses, the solicitor offered to waive the time and take the depositions immediately or without delay, and notified counsel that he would press for trial at the August Term.
Finally, the solicitor and counsel for the private prosecution stated that they could, with some effort, secure the presence of each of the witnesses for the defendant, and would do so upon request if counsel for defendant were unable to prevail upon them to appear at the trial.
There was no affidavit by defense counsel that they had not had time to prepare for trial.
Upon this showing the ruling on the motion for a continuance was a matter resting in the sound discretion of the trial court. S. v. Gibson,ante, 497; S. v. Strickland, ante, 201; S. v. Rising, 223 N.C. 747,28 S.E.2d 221; S. v. Wellmon, 222 N.C. 215, 22 S.E.2d 437; S. v. Allen,222 N.C. 145, 22 S.E.2d 233; S. v. Godwin, 216 N.C. 49,3 S.E.2d 347; S. v. Lea, 203 N.C. 13,164 S.E. 737. It is not seriously contended that any constitutional right belonging to the defendant was infringed in disposing of the matter. S. v. Farrell, 223 N.C. 321, 26 S.E.2d 322; S.v. Whitfield, 206 N.C. 696, 175 S.E. 93; S. v. Ross, 193 N.C. 25,136 S.E. 193. Indeed, the record negatives any suggestion of want of due process or unconstitutionality. Franklin v. South Carolina, 218 U.S. 161,54 L.Ed. 980; Minder v. Georgia, 183 U.S. 559, 46 L.Ed. 328.
In justification of the ruling, it may be noted that Dr. Taylor, whose presence was desired by the defendant, appeared at the trial and was used as a witness, and both Doctors Owen and Wharton gave expert testimony in the case without any suggestion of unpreparedness due to lack of time or want of preparation. Then, too, Doctor Sharpley's statement was offered in evidence by the defendant under agreement with the solicitor that it would be accepted as true. Thus the defendant had the benefit of the testimony of all of his witnesses. No hurtful error has been made to appear in respect of the ruling. The exception is not sustained.
II. Exceptions to admissions and exclusions of evidence: While the defendant entered a large number of exceptions to admissions and exclusions of evidence, only four or five questions arising thereon need presently engage our attention. Many of the evidentiary exceptions seem to have been taken out of the abundance of caution. In a number of instances, the record fails to disclose what the excluded evidence would have been, and several objections seem to have been sustained on the ground of repetitiveness.
1. The defendant was 37 years old, a member of a prominent family, weighed about 185 or 190 pounds, well educated and had considerable *Page 670 
business interests. The deceased was 28 years old, weighed about 100 pounds, and had been married to the defendant eight years. The State was allowed to show frequent quarrels, separations, reconciliations and ill-treatment of the deceased by the defendant throughout most of their married life. The main cause of all this was the defendant's excessive use of intoxicating liquors. When sober, his domestic relations were reasonably harmonious. In other words, the prosecution was allowed to paint the defendant before the jury as "not the man that God made, but the man that liquor marred."
The defendant contends that the court erred in allowing the prosecution to go back over his entire married life with the deceased, and thus bring before the jury his general conduct and character to speak against him, when he had neither gone upon the witness stand nor put his character in issue. This evidence was competent as tending to show malice on the part of the defendant or a settled state of feeling inimical to the deceased, and the decisions so hold. S. v. Allen, 222 N.C. 145, 22 S.E.2d 233; S. v.Goss, 201 N.C. 373, 160 S.E. 357; S. v. Kincaid, 183 N.C. 709,110 S.E. 612; S. v. Langford, 44 N.C. 436; S. v. Rash,34 N.C. 383; 40 C. J. S. 1159. The exception is not sustained.
2. The prosecution sought to show by M. F. Courie, hotel operator at Morehead City, that in 1944, the defendant and his wife spent a week at the beach and fell to quarreling while on their vacation. On cross-examination, the witness stated: "They had been there two or three times before and seemed to be getting along all right." Then this question: "He gave her every consideration and comfort?" Objection: sustained; exception.
At this point, counsel for defendant made inquiry as follows: "May I inquire if it is permissible for the State to show ill-will on the part of James Creech towards his wife and not permissible for us to show by evidence that he exhibited good-will towards her?" The court: "Yes."
In the light of the record it is not altogether clear as to just what was intended by the court's reply. On numerous occasions, prior and subsequent to the inquiry and response, the defendant was allowed to show that, except when drinking, he was kind, considerate and attentive to his wife's wishes and needs, and that they got along very well together.
Of course, if the court intended to say, and did say, as the defendant contends the answer means, i. e., that the defendant was not permitted to show want of ill-will be evidence of kind treatment, then the response was infelicitous. 40 C. J. S. 1160. However, conceding its infelicity, it does not appear that harmful consequences resulted therefrom. It was abundantly established by witnesses on both sides that the disquietude of the defendant's home came only from the curse of strong drink and tippling. S.v. Capps, 134 N.C. 622, 46 S.E. 730; S. v. Johnson, 48 N.C. 266. *Page 671 
Indeed, Leonard Woodall, brother of the deceased and a witness for the prosecution, said on cross-examination: "The defendant provided a nice home and furnished it well. . . . He showed every affection towards my sister and gave her practically everything a man of his means could give."
It is not enough to show error in the trial of a cause. To prevail on appeal, it must be made to appear that the appellant's rights have been injuriously and prejudicially affected. S. v. Beal, 199 N.C. 278,154 S.E. 604. The party alleging error, "not only has the laboring oar, but the tide is also against him. Error must be shown; it will not be presumed." Cole v. R. R., 211 N.C. 591, 191 S.E. 353. This burden does not seem to have been successfully carried in respect of the instant exception. Indeed, the defendant's generous treatment of his wife when sober, was attested by the State's own witnesses, and no doubt the trial court thought the defendant was only belaboring a matter which was conceded or really not disputed. Without approving the ruling, we do not sustain the exception, as no baneful consequence has been made to appear.
3. The defendant sought to show by Dr. J. F. Owen, a psychiatrist, that at the time of the homicide he was not capable of forming a deliberate and premeditated purpose to kill, with appreciation and understanding of what he was doing. On cross-examination, the prosecution was allowed to ask the witness whether he was being paid to testify for the defendant. His answer was that he made no statement about testifying, but that he charged the defendant $500, and that he would not have been there if he had not been paid. "Q. So, you merely came here in the capacity of a paid employee and a paid witness for the defendant?" A. "Yes, sir." Objection: overruled; exception. This examination was permissible to test the bias or partiality of the witness towards the party by whom he was called or introduced.Johnson v. R. R., 163 N.C. 431, 79 S.E. 690; S. v. Beal, supra; Wigmore on Evidence (3d Ed.), Sec. 961. The exception is not sustained.
4. The defendant called his father as a witness to testify concerning his mental condition shortly after the homicide when the defendant stopped to inform him of the killing; also to tell, in a general way, to what extent the defendant had been drinking lately and the effect it had had upon his mind. On cross-examination, the prosecution was allowed to inquire into the defendant's business activities, the extent of his farming operations, his management of a large tobacco warehouse in Smithfield, etc. Objection; overruled; exception. This examination was permissible to show the defendant's mental capacity despite his use of intoxicants. The exception is not sustained.
The prosecution was also allowed to show by the cross-examination of this witness that the defendant had been twice married and twice divorced before his marriage to the deceased. Objection: overruled; exception. *Page 672 
It must be conceded that the admission of this evidence was an inadvertence. It was neither relevant nor material to the charge upon which the defendant was being tried. It was incompetent, but its prejudicial effect is without support or confirmation on the record. S. v. Perry,226 N.C. 530, 39 S.E.2d 460. Cf. Lasater v. State (Tex.Crim.App.),227 S.W. 949. The defendant was being tried in the county where he had lived from boyhood. He was well known, and no doubt the jury was acquainted with his entire career. Nevertheless, disregarding the common knowledge of the community, the admission of this evidence does not appear to have had any appreciable effect on the verdict. "Admittedly, such evidence was incompetent, though not prejudicial." Payne v. Com., 255 Ky. 533, 75 S.W. (2) 14. It is not enough for the appellant to show error, and no more. He must make it appear that he was prejudiced thereby. S. v. Perry, supra; S.v. King, 225 N.C. 236, 34 S.E.2d 3. The ruling is disapproved, but the exception is not sustained for the reason that only a harmless inadvertence has been made manifest.
III. Exceptions to the charge: The defendant entered upon the trial with the common-law presumption of innocence in his favor and with the burden on the prosecution to establish his guilt beyond a reasonable doubt. S. v.Singleton, 183 N.C. 738, 110 S.E. 846. His plea of traverse put his guilt in issue. S. v. Harvey, 228 N.C. 62, 44 S.E.2d 472. On the trial he neither admitted the killing, nor did he take the witness stand. It was therefore incumbent upon the prosecution to make out the case in all of its elements or to establish the guilt of the defendant beyond a reasonable doubt. S. v. Grass, 223 N.C. 31, 25 S.E.2d 193. This, the prosecution proceeded to do by first establishing an intentional killing with a deadly weapon. Then evidence was offered tending to show premeditation and deliberation, which, with the presumptions arising from an intentional killing with a deadly weapon, was sufficient to establish the crime of murder in the first degree. S. v. Floyd, 226 N.C. 571, 39 S.E.2d 598;S. v. Harris, 223 N.C. 697, 28 S.E.2d 232; S. v. Evans, 198 N.C. 82,150 S.E. 678.
In this connection there is one exception directed to a portion of the charge which deserves immediate attention. In a single instance, touching the question of presumptions, the court instructed the jury that, "If the State has satisfied you beyond a reasonable doubt that the defendant killed the deceased with a deadly weapon, as I have said, the law presumes that it was done with malice, . . . and (if) you find beyond a reasonable doubt that the defendant intentionally killed the deceased with malice, it would be your duty to return a verdict of guilty of murder in the second degree, subject to the instructions that will be hereafter given you as to responsibility or mental capacity."
The criticism of this instruction is that the presumption of malice was made to rest on the killing of the deceased by the defendant with a deadly *Page 673 
weapon without regard to whether the killing was intentional. S. v.McNeill, ante, 377; S. v. Snead, 228 N.C. 37, 44 S.E.2d 359; S. v.Childress, 228 N.C. 208, 45 S.E.2d 42; S. v. Debnam, 222 N.C. 266,22 S.E.2d 562. The exception is untenable because on several previous occasions the court had stated the presumption could arise only from an intentional killing with a deadly weapon, and the expression, "as I have said," refers to these previous instances. Moreover, before concluding the instruction the lapsus linguae was corrected. S. v. Davis, 223 N.C. 381,26 S.E.2d 869; S. v. Utley, 223 N.C. 39, 25 S.E.2d 195. the exception is not sustained.
The real debate, however, was over the defendant's contention, based on evidence offered and elicited by him, that he was in such a state of mental confusion, superinduced by chronic alcoholism, as not only to render him incapable of premeditation and deliberation, but also to deprive him of any moral perception or legal responsibility for his acts.
In submitting this phase of the case to the jury, the trial court followed closely the adjudications on the subject, especially the case ofS. v. Murphy, 157 N.C. 614, 72 S.E. 1075, which he evidently had before him when charging the jury. The court's instructions also reveal an acquaintance and familiarity with and a flavoring of the following cases:S. v. Hairston, 222 N.C. 455, 23 S.E.2d 885; S. v. Cureton, 218 N.C. 491,11 S.E.2d 469; S. v. Alston, 215 N.C. 713, 3 S.E.2d 11; S. v.Bracy, 215 N.C. 248, 1 S.E.2d 891; S. v. Edwards, 211 N.C. 555,191 S.E. 1; S. v. Alston, 210 N.C. 258, 186 S.E. 354; S. v. Walker,193 N.C. 489, 137 S.E. 429; S. v. Ross, 193 N.C. 25,136 S.E. 193; S. v. English, 164 N.C. 497, 80 S.E. 72; S. v.Shelton, 164 N.C. 513, 79 S.E. 883; S. v. Allen, 186 N.C. 302,119 S.E. 504; S. v. Hancock, 151 N.C. 699, 66 S.E. 137; S. v. Kale,124 N.C. 816, 32 S.E. 892. Indeed, some of the instructions are couched in the very language of the decisions.
It is the law of this jurisdiction that an affirmative defense, e.g., drunkenness or insanity, which partakes of the nature of a plea of confession and avoidance, is to be satisfactorily proved by the defendant unless it arise out of the evidence produced against him. S. v. Swink,ante, 123; S. v. Hammonds, 216 N.C. 67, 3 S.E.2d 439; S. v. Alston,214 N.C. 93, 197 S.E. 719; S. v. Keever, 177 N.C. 114, 97 S.E. 727; S. v.Craton, 28 N.C. 178. The onus of showing "justification, excuse or mitigation." to the satisfaction of the jury, is on the defendant. S. v.Willis, 63 N.C. 26; S. v. Carland, 90 N.C. 668; S. v. Brittain, 89 N.C. 481;S. v. Ellick, 60 N.C. 456 (see note to this case in 3 Anno. Ed.). "Matters in extenuation and excuse, or of discharge by reason of insanity," are for the defendant. S. v. Jones, 191 N.C. 753, 133 S.E. 81. "All matters of excuse or mitigation devolve upon the prisoner." S. v. Rollins,113 N.C. 722, 18 S.E. 394. *Page 674 
Speaking to the question in S. v. Foster, 172 N.C. 960, 90 S.E. 785,Walker, J., delivering the opinion of the Court, said: "That the burden is upon the prisoner to satisfy the jury by proof of any matters of justification, excuse, or mitigation has been too long settled to be now questioned. The jury were instructed that the burden was upon the State to establish beyond a reasonable doubt that the prisoner killed the deceased with premeditation and deliberation. The charge was correct and in accordance with the authorities."
Finally the whole matter in respect of the burden of proof and the burden of satisfaction, where insanity or mental debility is interposed as a defense, is thoroughly discussed in the case of S. v. Harris,223 N.C. 697, 28 S.E.2d 232, and it would only be a work of supererogation to restate it here. The presumption that the accused was sane and responsible for his acts persists until the contrary is shown to the satisfaction of the jury. Therefore, if the jury are left in doubt as to the sanity or responsibility of the accused, the presumption prevails.S. v. Smith, 77 N.C. 488.
As a dernier ressort the defendant says that while no one of his exceptions, standing alone, may be sufficient to work a new trial, nevertheless taken in their totality, they make it quite clear that the scales of justice were weighted against him. S. v. Hart, 186 N.C. 582,120 S.E. 345, and that in no event should a case of this importance be upheld on the doctrine of harmless error.
The position might prevail but for the conduct and declarations of the defendant on the night of the homicide which clearly revealed his stubborn purpose and unbending will to kill the deceased, even over the efforts of those in the house to protect her, and an immediate consciousness of wrong which prompted the defendant to seek the sheriff's office, knowing full well that as between himself and the officers it was only a question as to who would make the call first. At any rate, these are the overshadowing facts of the record, and the jury has found them to be true. Not until the defendant reached the jail did he make any self-serving declaration. He then, for the first time, said to the jailer, "I am as crazy as hell." This was his last comment on the subject so far as the record discloses.
True it is, that the atrocity of the defendant's conduct was a circumstance from which opposite conclusions were sought to be drawn; the one that it exhibited a mind fatally bent on mischief; the other that it revealed a diseased intellect. The jury attributed it to the former.
The test of responsibility is the capacity to distinguish between right and wrong at the time and in respect of the matter under investigation. S.v. Potts, 100 N.C. 457, 6 S.E. 656; S. v. Brandon, 53 N.C. 463. He who knows the right and still the wrong pursues is amenable to the criminal law. S. v. Jenkins, 208 N.C. 740, 182 S.E. 324. On the other hand, if "the accused should be in such a state of mental disease as not *Page 675 
to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing wrong," the law does not hold him accountable for his acts, for guilt arises from volition, and not from a diseased mind. S. v. Haywood, 61 N.C. 376.
We are aware of the criticism of this standard by some psychiatrists and others. Still, the critics have offered nothing better. It has the merit of being well established, practical and so plain "that he may run that readeth it." Hab. 2:2. Moreover, it should be remembered that the criminal law applies equally to all sorts and conditions of people. It ought to be sufficiently clear to be understood by the ordinary citizen.
The conclusion is reached that no reversible error has been made to appear. Hence, the verdict and judgment will be upheld.
No error.