## STATE v. WILL WILLIAMS.

### (Filed 6 May, 1925.)

1. **Homicide—Criminal Law—Murder—Premeditation and Deliberation—Mental Weakness—Drunkenness—Burden of Proof.**

   On a trial for a homicide, by killing the deceased with a shotgun, where the prisoner's counsel contends and offers evidence of the prisoner's weak mental condition and of intoxication, upon the question of premeditation and deliberation, to reduce the offense from murder in the first degree to murder in the second degree: *Held,* the fact of intoxication alone does not have the effect contended for, under the evidence in the case, and the offense will be that of murder in the first degree, if the condition of the prisoner's mind at the time of the killing was sufficient under the evidence for him to have premeditated and deliberated upon the act, the burden being upon the State to prove this beyond a reasonable doubt.

2. **Same—Intent—Instructions—Appeal and Error.**

   *Held,* under the facts upon this trial for a homicide, the charge upon first degree murder was sufficiently clear, and the jury could not have been misled as to the correctness of the application of the law as to the previous intent of the prisoner necessary to sustain a verdict of the highest degree of the crime.

3. **Criminal Law—Reasonable Doubt—Burden of Proof.**

   The burden of showing guilt beyond a reasonable doubt required of the State in criminal cases, though not easily defined, imports an uncertainty of mind by the jury after a full, fair and reasonable consideration of the evidence.

APPEAL by defendant from *Lane, J.,* at November Term, 1924, of SCOTLAND.

This is a criminal action in which defendant was convicted of murder in the first degree. From the judgment in accordance with the statute, that defendant suffer death by electrocution, defendant appealed to the Supreme Court. Assignments of error, based upon exceptions to instructions of the court to the jury and to the refusal of the court to give instructions as requested by defendant, appear in the opinion.

The evidence for the State was as follows:

Lewis Gibson testified that on 22 June, 1924, he was coroner of Scotland County, and as such conducted the inquest over the body of Frank Green; the body when first seen by the witness was lying beside his bed in his home with four holes in his breast; he had been shot with a shotgun. He was in his night clothes. He was dead. His death was caused by gunshot wounds.

Sylvia Green testified that Frank Green, the deceased, was her husband; she and her husband were at home on Saturday night, 22 June,

1924; between one and two o'clock a. m. some one came to the house and, rapping on the side of the house, called, "Hello, Uncle Frank," two or three times. Frank got out of bed and replied, "Hello, who is that?" Some one said, "Come out here; ain't nobody to hurt you." Frank got up, went to the door, and said again, "Who is that?" The reply was, "Step out here, I want to see you. I already told you it wasn't anybody to hurt you. I want you to carry me off a piece." Frank then said, "That's Will Williams." Just as he said this, he was shot. Frank came back into the house, fell upon the bed, and died at once.

Witness further testified that she saw Will Williams on Thursday before this Saturday night. He came to the field, where witness and her children were chopping cotton. He acted as if he was drunk. He took a hoe and began to chop up cotton. Witness told him that if he could not chop better than he was doing to get out of the field; that if her husband caught him chopping cotton that way he would run him out of the field. He replied, "God damn old man Frank. I will kill him." He had been drinking and vomited while in the field.

Rosa Green, daughter of this witness and deceased, corroborated her mother as to the occurrences at their home on Saturday night, and also in the cotton field on Thursday. She also testified that defendant asked her, if he killed her father, could he take possession of the house, and that she told him "No."

George Nichols testified that he lived near the home of defendant and Spencer Gay. He heard a gun fire the night Frank Green was killed. Just before that he heard an automobile near his house. It stopped near the bridge, and Spencer Gay got out and cranked it up. Shortly after this, witness heard the gun fire up at Frank Green's house. Pretty soon after, he saw Will Williams pass his window going in the direction of Spencer Gay's house. He then heard an automobile up toward Gay's house.

Frank Chavis testified that he went to Frank Green's house the morning after the shooting. While there he saw some tracks around the house, about a hundred yards from the house, leading toward the home of defendant and Spencer Gay. These tracks came into the road where an automobile had turned around. Witness tracked the automobile toward Spencer Gay's house. Defendant was at Frank Green's house that morning with the officers. An officer had Will Williams' shoes. One of the shoes fitted one of the tracks found near the house. Defendant put on the shoe. The track he then made was like the track found there when witness first went to the house that morning. There was a dent in both tracks. Defendant's shoe had a rubber heel which was worn some.

Spencer Gay was then sworn and offered as a witness by the State. This witness had been indicted and arraigned for the murder of Frank Green. On motion of the solicitor for the State, this indictment and the indictment of defendant had been, without objection, consolidated for the purposes of trial. The joint trial had proceeded until the conclusion of the testimony of the witness Frank Chavis. Spencer Gay, through his counsel, then tendered the State a plea of guilty of murder in the second degree. This plea was accepted, and the judge announced that Spencer Gay was no longer on trial, and that only defendant was now on trial. Spencer Gay testified as follows:

He had known defendant, Will Williams, five or six years. He saw him Thursday before Frank Green was shot. Defendant came to him that night and said, "The women folks, Miss Sylvia and Rosa, want me to kill the old man, Frank." He wanted witness to carry him off somewhere. Witness refused to do so.

On Saturday following, witness was on his way to Gibson. Defendant came to his house. On his return from Gibson, witness met up with defendant. At defendant's request, witness took him to Effie Davis' and then to Laurel Hill. They went by Hattie Purvis' and then to Sexton's, where defendant got a little whiskey. Both witness and defendant had been drinking. Defendant swapped off whiskey for wine. When they were near George Nichols' house, the car choked down. Witness cranked the car and defendant went off. Witness went to sleep in the car. When defendant came back he told witness that he had been to Frank Green's house and shot the old man—said he did not know whether he had killed him, but that he had shot him. Defendant put the gun in the car and they drove off. Witness saw defendant again next morning.

The State rested, and defendant offered the following evidence:

Will Williams, the defendant, testified that on Saturday he went to Gibson with Spencer Gay in his car; that they drove to various places, got whiskey, and finally came to the woods near George Nichols'. Spencer Gay then said to witness: "This is a good time to kill old man Frank. You know them women have been trying to get you to kill him. Listen to me. I done been talking to the women. You go get the gun and come back here. I will stay here until you get back." Witness got the gun and returned to Spencer Gay. He then said to witness: "You go to old man Frank's house, call him out and shoot him. Then come back to me. Knock on his house and say, 'Come out,' and if he asks who is there, say, 'It ain't nobody to hurt you.'" Witness said to Gay, "Won't the bloodhounds track me?" Spencer replied, "No, they can't track you any further than my car." Witness then

testified that he went and did what Spencer told him and came back to the car. Witness and Spencer Gay then went off together in the car.

Witness further testified that Sylvia Green and Rosa Green, wife and daughter of deceased, had asked him to kill Frank Green; they had said he was so mean they wanted him killed. Witness had refused to do so—had nothing against old man Frank. The night he killed him he had drunk about a pint of whiskey and was drunk; does not remember all that happened. It all came to him like a dream the next morning.

On cross-examination, the solicitor asked the witness: "You shot him with the intention that if you killed him, you would take charge of the house, the four-horse crop and the girls?" Witness replied, "Yes, sir."

Defendant offered several witnesses who testified as to their opinion of his mental capacity. They testified that defendant never was very bright; that he had average intelligence and knew right from wrong. Tom Williams, father of defendant, testified that defendant was "franzy-minded," didn't use good common-sense, and had been to school "mighty little."

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*
*L. B. Prince and E. M. Gill for defendant.*

CONNOR, J. In view of the grave consequences to the defendant, of the judgment in this case, we have stated the evidence in full, substan-. tially as the same appears in the statement of the case on appeal. If the facts are as defendant himself testifies, he is guilty of murder in the second degree, at least. His testimony as to the essential facts is fully and abundantly corroborated by the testimony of other witnesses. He admits the intentional killing by him of Frank Green, the deceased, with a shotgun, and there is no evidence of justification or excuse. His counsel concede that upon all the evidence he is guilty of murder in the second degree, and contend only that by reason of weak mental capacity and intoxication, as the result of having drunk whiskey during the night of the homicide, he was unable to "deliberate and premeditate" to such a degree as is essential to guilt of murder in the first degree, as found by the jury. They do not contend that there is evidence tending to show that defendant was not responsible for his act and, therefore, not capable of committing crime for either reason.

There were no exceptions to evidence submitted to the jury and no exceptions to evidence offered and excluded by the court. The charge of the court appears in full in the statement of the case on appeal.

His Honor instructed the jury fully and correctly upon the law applicable to the facts which the jury might find from the evidence. He defined the terms "premeditation" and "deliberation," and instructed the jury that the burden of proving both beyond a reasonable doubt was upon the State. He stated the contentions of both the defendant and the State upon this phase of the case, fully and without objection from the learned counsel for defendant. He instructed the jury as follows:

"Now, in order for a person to be guilty of murder in the first degree, there must be an intent to kill; there must have been sufficient mental capacity to form that intent in the mind, and in order for a person to be guilty of any crime there must have been sufficient mental capacity to know right from wrong.

"Drunkenness under the law is no excuse for crime and does not relieve the person of guilt for crime entirely. But in the case of murder, if a person is so intoxicated and rendered so insensible and so irrational by intoxication of any kind, or is naturally so weak-minded from natural causes that he cannot form an intent and cannot premeditate and deliberate, then it reduces the offense from murder in the first degree to murder in the second degree."

Defendant's counsel except to these instructions and assign same as error. The assignment cannot be sustained. The instructions are supported by opinions of this Court in *S. v. Allen,* 186 N. C., 302; *S. v. Foster,* 172 N. C., 960; *S. v. English,* 164 N. C., 497. His Honor did not instruct the jury that an intent to kill was the only element in the crime of murder in the first degree. In view of the full and correct charge as to premeditation and deliberation, the jury could not, as intelligent men, have been misled to the prejudice of defendant.

The assignment of error based upon the exception to the definition of reasonable doubt given by his Honor in his charge cannot be sustained. His Honor told the jury that "by the term reasonable doubt is meant a doubt which has a valid and satisfactory reason for it; one arising out of the evidence in the case—just what the terms imply." The term "reasonable doubt" is not easily defined. It imports an uncertainty of mind, after a consideration of all the evidence, tending to establish the existence of the fact alleged by him upon whom the law places the burden; this uncertainty of mind must be the result of a full, fair, and reasonable consideration of all the evidence. Black's Law Dictionary.

The fourth and fifth exceptions are to the failure of his Honor to give instructions requested in apt time and in writing. Both these instructions were given in the charge, the principles of law embodied

in them being clearly stated and fully explained by his Honor.   The remaining exceptions are formal.

The issue in this case involved the life and death of defendant.   The record shows that the trial was conducted by the presiding judge with full appreciation of the grave responsibilities imposed upon him and in strict compliance with the law.   Defendant has forfeited his life and must now suffer death; this is in accordance with the law of the State, for defendant has wilfully, unlawfully and feloniously, with malice aforethought, killed and murdered Frank Green, against the peace and dignity of the State; the murder was a deliberate and premeditated killing; the punishment prescribed by law is death.

On appeal to this Court, where only matters of law or legal inference can be considered, we find

No error.