## STATE v. JAMES CREECH.

(Filed 7 January, 1949.)

**1. Criminal Law § 44—**

Defendant's motion for continuance was based upon the unpreparedness of certain expert witnesses to testify before consultation with a third, and the necessity for time to take depositions of two out-of-State witnesses. The solicitor disclosed that the third expert witness was available, and offered to permit defendant to introduce in evidence the written statement of the main out-of-State witness. *Held:* The motion for continuance was addressed to the sound discretion of the trial court, and the want of prejudice in the denial of the motion is apparent in this case in that the experts testified without suggestion of want of preparation and the statement of the out-of-State witness was admitted under the agreement.

STATE *v*. CREECH.

**2. Homicide § 20:  Criminal Law § 32c—**

In a prosecution for uxoricide, it is competent for the State to show defendant's conduct over the period of his married life, involving frequent quarrels, separations and ill-treatment of the deceased by the defendant during the times of defendant's periodic drunkenness, for the purpose of showing malice or a settled state of feeling inimical to the deceased.

**3. Same—Exclusion of testimony of one witness as to matter amply established by witnesses for both sides held not prejudicial.**

In this prosecution for uxoricide, the State's evidence tended to show that defendant treated his wife considerately and generously when sober, but that during the times of defendant's periodic drunkenness he was guilty of cruelty and harshness toward her.  The defendant introduced testimony of his good treatment of his wife when sober.  The court excluded testimony on cross-examination of one of the State's witnesses as to defendant's good treatment of his wife on certain occasions, stating in effect, in response to interrogation by defendant's counsel, that defendant could not show considerate conduct to rebut the State's evidence of ill-will. *Held:* While the evidence was competent, its exclusion is not held for prejudicial error, since the fact was amply established by the testimony of witnesses for both the State and defendant, and the ruling of the trial court was apparently to prevent defendant from belaboring a matter which was conceded or really not disputed.

**4. Criminal Law § 81b—**

The burden is upon appellant not only to show error but also that the error injuriously and prejudicially affected his cause, as the presumption is against him.

**5. Criminal Law § 42c—**

It is competent for the prosecution to disclose by cross-examination of defendant's expert witness that defendant paid him to testify in order to test the bias or partiality of the witness.

**6. Criminal Law § 31h—**

Where defendant's witness testifies as to defendant's mental incapacity due to habitual drunkenness, it is competent for the State on cross-examination to inquire as to defendant's extensive business activities in order to show defendant's mental capacity despite his use of intoxicants.

**7. Homicide § 17—**

In a prosecution for uxoricide, evidence that defendant had been twice married and twice divorced before his marriage to deceased, is irrelevant to the issue and incompetent, but its admission in the present case, where defendant was tried by a jury selected from the county where he had lived from boyhood and which doubtless knew defendant's entire career, *is held* a harmless inadvertence.

**8. Criminal Law § 28—**

Defendant enters upon a trial with the common law presumption of innocence in his favor, and upon his plea of not guilty, the burden is upon the State to establish his guilt beyond a reasonable doubt.

**9. Homicide § 16—**

Where, in a prosecution for first degree murder, defendant does not admit the killing nor take the witness stand, the burden is upon the State to establish each element of the offense beyond a reasonable doubt, which it may do by establishing an intentional killing with a deadly weapon with further evidence that the killing was premeditated and deliberate.

**10. Homicide § 27b—**

The failure of the court, in a single instance, to charge that the killing with a deadly weapon must be intentional in order to raise the presumption of malice will not be held for reversible error when in other portions of the charge the rule is correctly stated and the *lapsus linguæ* is corrected by the court before concluding the instructions.

**11. Criminal Law § 5c: Homicide § 16—**

A defendant is presumed sane, and the burden is upon him to show to the satisfaction of the jury the affirmative defense of insanity, or drunkenness to an extent which renders him mentally incompetent.

**12. Criminal Law § 81c (1)—**

Defendant's exceptions, even considered in their totality, *held* not to disclose prejudicial error in this prosecution for murder in the first degree, in view of the fact that the record as a whole discloses defendant's stubborn purpose to kill deceased and an immediate consciousness of wrong which prompted him to surrender to the sheriff.

**13. Criminal Law § 5a—**

The test of mental responsibility for crime is the ability to distinguish between right and wrong at the time and in respect to the matter under investigation.

BARNHILL, J., dissenting.

ERVIN, J., concurring in dissent.

APPEAL by defendant from *Williams, J.,* August Term, 1948, of JOHNSTON.

Criminal prosecution on indictment charging the defendant with the murder of his wife, Mattie Creech.

The record discloses that on 28 July, 1948, around the hour of midnight, the defendant shot and killed his wife with a double-barrel shotgun in the home of a neighbor, where she had gone and was staying temporarily as a result of a quarrel with the defendant on the 16th of the same month. The scene of the homicide was in the Brogden section of Johnston County about a quarter of a mile from the defendant's home.

The August Term of Johnston Superior Court convened on 16 August, 1948, and the grand jury returned a true bill against the defendant on the first day of the term. Arraignment was had and plea entered on the same day, and the defendant moved for a continuance on the ground that he had not had sufficient time to prepare his defense. Affidavits and

exhibits were submitted, and the solicitor agreed, upon request, to aid in the production of the witnesses for the defendant, or to admit the exhibits as their sworn testimony and the truth of the statements contained therein. The motion was thereupon overruled, a special venire was ordered, and the case was set for hearing on the following morning. Exception.

### THE STATE'S EVIDENCE.

In assuming the burden of establishing the crime as charged, the prosecution offered evidence tending to show that Mrs. Elsie Mae Creech (with whom the defendant's wife was then staying temporarily) took the defendant's wife to Durham on Tuesday night, July 27, so that she might enter Duke Hospital for an examination on the following morning. This was done and they returned home late that evening. At about 11:00 p.m., the defendant appeared at the home of Elsie Mae Creech, and after being invited in with a cordial salutation, he stepped into the hall and said: "Elsie Mae, what did they find wrong with Mattie today?" He was informed that X-rays were taken and she would get the reports later. About that time the defendant's wife came up and he asked her the same question. Elsie Mae Creech then asked the defendant and his wife to go into the living room, which they did. She followed in a few minutes and the defendant remarked, "I have some whiskey out there in the car if you girls would like to have a drink." They both declined. He then said: "Well, I have got some peaches out there, would you like to have some of them?" Up to this point the defendant appeared to be normal and in possession of his normal faculties. After some conversation about the peaches, he stood up and said, "There is no use beating around the bush any longer," and looking at his wife he inquired, "Are you planning to go back home or not?" She replied that "she was not planning to"; whereupon he became angry, used some profanity, and said a lawyer would see her in the morning. He then left, got in his car, and drove off.

In about ten minutes the defendant returned with a shotgun, threatening to kill everybody in the house. Johnnie Grimes, who, with his family, lived in a part of the house, grappled with the defendant in the hall and tried to take the gun away from him, but was unable to do so. While this was taking place, the other occupants of the house went into an adjoining bedroom. All the lights in the house were on, except in this bedroom. Johnnie Grimes then jumped back through the door into the bedroom, and he, Elsie Mae and Mattie pushed against the door to keep the defendant from entering. After pushing the door four or five times, the defendant fired through the panel of the door and struck his wife who slumped down to the floor. The defendant then began to push the door anew, and Johnnie Grimes advised the others to flee for safety. This they did, hiding in the weeds outside and under the house. The defendant soon

came out and Elsie Mae Creech heard him say, "I especially wanted to kill Mattie and Elsie Mae." Pretty soon the defendant returned to the house, entered the room where his wife lay, took aim and shot the top of her head off. He then went out on the back porch, set the gun down in the corner, and called Johnnie Grimes to come and take him to the sheriff. In a few minutes the defendant's car was heard to start up, and go off in the direction of Smithfield.

Mary Edna Grimes, age 13, who had sought safety by hiding in the edge of the adjacent woods, saw the defendant get in his car. She says, "He reached towards the glove compartment, took out a bottle and turned it up to his head. . . . He must have taken more than one drink as he kept it up there and took it down and then got another. He drove off towards Smithfield."

Sometime between 12 and 1:00 a.m. the defendant appeared at the sheriff's office and gave himself up to Deputy Sheriff Lester Hales. After inquiring for the sheriff, the defendant said: "Well I just as well tell you: I blowed her damn brains out. . . . I killed Mattie. This damn Duke Hospital, I have stood it as long as I can and I blowed her damn brains out." The defendant turned over to the officer his pocketknife and $427 in money which he had on his person. He counted the money in the presence of the officer. His count was accurate. The jailer said the defendant "looked like a crazy man; drunk and crazy too." Cross-examination: "I did not hear him speak but once. He said, 'I am as crazy as hell.'" The officers then went to make an investigation. They located the gun at the house; and on the front seat of the defendant's car they found a bottle with some whiskey in it. These were offered in evidence.

The prosecution offered Jack Gardner as a witness, who testified that the defendant came to his filling station between 9 and 10 o'clock on the evening of the homicide. He was there an hour or more, during which time he took two or three drinks. He said he had been to Pinehurst and had called his wife from there at Duke Hospital but the nurse would not let him speak to her. He remarked that "he wished she was dead; wished he could wake up in the morning and hear that she was dead, that would be the sweetest music he had ever heard." When he left the filling station, "he could walk all right; perfectly all right; and talked all right. He drove his car away." There was a basket of peaches and a double-barrel shotgun in the back of the defendant's car.

### The Defendant's Evidence.

The defendant refrained from going on the witness stand, but offered evidence intended to satisfy the jury of his mental debility or insanity at the time of the homicide.

On Wednesday, July 21, the defendant took a motor trip to Valdosta, Ga. He picked up a young man in Lumberton, a hitch-hiker, and took

him along for company and to help with the driving. The defendant got very drunk on this trip. On his way back he spent two days and two nights in a hospital at Savannah, Ga. Dr. John G. Sharpley, of the Hospital, certified that when the defendant came there on the 22nd, he showed symptoms of "chronic alcoholism . . . and some mental confusion. . . . He was discharged on July 24th, his nervousness had ceased and he seemed to be in very excellent spirits. He showed no signs of mental aberration."

The defendant offered a number of witnesses who testified that he was "heavily under the influence" on the night preceding and during the day of the homicide. And further that the defendant and his wife got along all right, except when he was drinking; that drink was the cause of their several separations.

Millard Parrish and Mrs. Cassie Lee testified that they drove past the home of Elsie Mae Creech on the night of July 28, between 11:30 and 12 o'clock, and within a short distance their car flashed against an automobile which had "slid off the road and into the edge of the woods on the left side." They ran by, but stopped at the first side road to go back and render assistance. Before they could turn round and while looking for a flashlight, the defendant appeared on the right-hand side of their car and got in the front seat. He was wet and looked like he was drunk. He said he wanted to go to the sheriff's office; that he had killed his wife. Later he said he wanted to stop and tell his father and mother what had happened. Pretty soon, he slumped over as if he were dozing. When they reached the father's house, the defendant got out of the car and went up the steps and had a conversation with his father and mother. They then took the defendant to the sheriff's office.

On the next day, Dr. Watson Wharton saw the defendant, said he appeared to be having a "hang-over" from being drunk. He took a specimen of his blood at about 12:20 p.m. and sent it to Dr. Haywood Taylor at Duke University for examination and laboratory analysis. Dr. Wharton gave it as his opinion that "12 hours prior to my examination he was not in condition, by reason of drunkenness, to understand and weigh the nature and consequences of his acts."

Dr. Taylor testified that the specimen of blood "contained alcohol to the extent of .14 per cent." He gave it as his opinion that if the specimen had been taken 12 or 13 hours earlier, it would have shown an alcoholic content of from .25 to .3 per cent; and that a person with that percentage of alcoholic concentration "would not be capable of forming a deliberate and premeditated intent to kill and know the consequences of it."

Dr. J. F. Owen, a psychiatrist of Raleigh, testified that in consequence of a telephone call from one of defendant's counsel around 10 o'clock on the morning of July 29th, he went to Smithfield at about 3:00 p.m. that

day and saw the defendant for a couple of hours. He returned later on August 2nd and spent a half-hour with him. In all, he saw the defendant three times before the trial. He gave it as his opiinon that "the defendant was not in a mental condition to think out beforehand what he intended to do and to weigh and understand the nature and consequences of his acts on the night of July 28th."

Mr. and Mrs. J. Rufus Creech, father and mother of the defendant, testified that when the defendant came to tell them of the killing he was not himself, "he wasn't natural . . . he wasn't right. . . . The expression in his eyes was awful . . . just like a wild man. . . . He had a wild, crazy look. . . . He didn't even look like himself."

Verdict: Guilty of murder in the first degree.

Judgment: Death by asphyxiation.

The defendant appeals, assigning errors.

*Attorney-General McMullan and Assistant Attorneys-General Bruton, Rhodes, and Moody for the State.*

*J. M. Broughton, Wm. B. Wellons, G. A. Martin, Norman C. Shepard, and Larry F. Wood for defendant.*

STACY, C. J., after stating the facts as above: We are here confronted with (1) the ruling on the motion for a continuance, (2) objections to admissions and exclusions of evidence, and (3) exceptions to the charge.

I. *Motion for continuance:* In support of the motion for a continuance, counsel for defendant submitted affidavits from Doctors J. F. Owen and Watson Wharton, each affirming his unpreparedness to give expert testimony in the case without first conferring with Dr. Haywood Taylor, toxicologist at Duke University, to whom a specimen of defendant's blood had been sent for examination and laboratory analysis. It was made to appear that Dr. Taylor was then at Myrtle Beach, S. C., on vacation and was not expected to return before 7 September.

In addition, it was asserted that Dr. John G. Sharpley and his nurse, Mrs. Rebecca Weathers, who had attended the defendant at a hospital in Savannah, Ga., on 22 July, 1948, were material witnesses and could not be reached by subpoena, and that counsel had arranged to take their depositions on 21 August for use in the trial of the cause.

In reply, the solicitor stated that Dr. Haywood Taylor was then at nearby Myrtle Beach, and had advised defense counsel by letter that he would be available at any time, upon request. The solicitor further stated that he had procured a written statement from Dr. John G. Sharpley showing the defendant's condition when he was in the hospital at Savannah; that he would turn this statement over to counsel for defendant and allow them to offer it in evidence as the sworn testimony

of both Dr. Sharpley and his nurse, and that he would admit the facts therein stated to be true. It was also asserted that when counsel for defendant gave notice of their intention to take the depositions of these witnesses, the solicitor offered to waive the time and take the depositions immediately or without delay, and notified counsel that he would press for trial at the August Term.

Finally, the solicitor and counsel for the private prosecution stated that they could, with some effort, secure the presence of each of the witnesses for the defendant, and would do so upon request if counsel for defendant were unable to prevail upon them to appear at the trial.

There was no affidavit by defense counsel that they had not had time to prepare for trial.

Upon this showing the ruling on the motion for a continuance was a matter resting in the sound discretion of the trial court. *S. v. Gibson, ante,* 497; *S. v. Strickland, ante,* 201; *S. v. Rising,* 223 N. C. 747, 28 S. E. (2) 221; *S. v. Wellmon,* 222 N. C. 215, 22 S. E. (2) 437; *S. v. Allen,* 222 N. C. 145, 22 S. E. (2) 233; *S. v. Godwin,* 216 N. C. 49, 3 S. E. (2) 347; *S. v. Lea,* 203 N. C. 13, 164 S. E. 737. It is not seriously contended that any constitutional right belonging to the defendant was infringed in disposing of the matter. *S. v. Farrell,* 223 N. C. 321, 26 S. E. (2) 322; *S. v. Whitfield,* 206 N. C. 696, 175 S. E. 93; *S. v. Ross,* 193 N. C. 25, 136 S. E. 193. Indeed, the record negatives any suggestion of want of due process or unconstitutionality. *Franklin v. South Carolina,* 218 U. S. 161, 54 L. Ed. 980; *Minder v. Georgia,* 183 U. S. 559, 46 L. Ed. 328.

In justification of the ruling, it may be noted that Dr. Taylor, whose presence was desired by the defendant, appeared at the trial and was used as a witness, and both Doctors Owen and Wharton gave expert testimony in the case without any suggestion of unpreparedness due to lack of time or want of preparation. Then, too, Doctor Sharpley's statement was offered in evidence by the defendant under agreement with the solicitor that it would be accepted as true. Thus the defendant had the benefit of the testimony of all of his witnesses. No hurtful error has been made to appear in respect of the ruling. The exception is not sustained.

II. *Exceptions to admissions and exclusions of evidence:* While the defendant entered a large number of exceptions to admissions and exclusions of evidence, only four or five questions arising thereon need presently engage our attention. Many of the evidentiary exceptions seem to have been taken out of the abundance of caution. In a number of instances, the record fails to disclose what the excluded evidence would have been, and several objections seem to have been sustained on the ground of repetitiveness.

1. The defendant was 37 years old, a member of a prominent family, weighed about 185 or 190 pounds, well educated and had considerable

STATE *v.* CREECH.

business interests. The deceased was 28 years old, weighed about 100 pounds, and had been married to the defendant eight years. The State was allowed to show frequent quarrels, separations, reconciliations and ill-treatment of the deceased by the defendant throughout most of their married life. The main cause of all this was the defendant's excessive use of intoxicating liquors. When sober, his domestic relations were reasonably harmonious. In other words, the prosecution was allowed to paint the defendant before the jury as "not the man that God made, but the man that liquor marred."

The defendant contends that the court erred in allowing the prosecution to go back over his entire married life with the deceased, and thus bring before the jury his general conduct and character to speak against him, when he had neither gone upon the witness stand nor put his character in issue. This evidence was competent as tending to show malice on the part of the defendant or a settled state of feeling inimical to the deceased, and the decisions so hold. *S. v. Allen,* 222 N. C. 145, 22 S. E. (2) 233; *S. v. Goss,* 201 N. C. 373, 160 S. E. 357; *S. v. Kincaid,* 183 N. C. 709, 110 S. E. 612; *S. v. Langford,* 44 N. C. 436; *S. v. Rash,* 34 N. C. 383; 40 C. J. S. 1159. The exception is not sustained.

2. The prosecution sought to show by M. F. Courie, hotel operator at Morehead City, that in 1944, the defendant and his wife spent a week at the beach and fell to quarreling while on their vacation. On cross-examination, the witness stated: "They had been there two or three times before and seemed to be getting along all right." Then this question: "He gave her every consideration and comfort?" Objection; sustained; exception.

At this point, counsel for defendant made inquiry as follows: "May I inquire if it is permissible for the State to show ill-will on the part of James Creech towards his wife and not permissible for us to show by evidence that he exhibited good-will towards her?" The court: "Yes."

In the light of the record it is not altogether clear as to just what was intended by the court's reply. On numerous occasions, prior and subsequent to the inquiry and response, the defendant was allowed to show that, except when drinking, he was kind, considerate and attentive to his wife's wishes and needs, and that they got along very well together.

Of course, if the court intended to say, and did say, as the defendant contends the answer means, *i.e.,* that the defendant was not permitted to show want of ill-will by evidence of kind treatment, then the response was infelicitous. 40 C. J. S. 1160. However, conceding its infelicity, it does not appear that harmful consequences resulted therefrom. It was abundantly established by witnesses on both sides that the disquietude of the defendant's home came only from the curse of strong drink and tippling. *S. v. Capps,* 134 N. C. 622, 46 S. E. 730; *S. v. Johnson,* 48 N. C. 266.

Indeed, Leonard Woodall, brother of the deceased and a witness for the prosecution, said on cross-examination: "The defendant provided a nice home and furnished it well. . . . He showed every affection towards my sister and gave her practically everything a man of his means could give."

It is not enough to show error in the trial of a cause. To prevail on appeal, it must be made to appear that the appellant's rights have been injuriously and prejudicially affected. *S. v. Beal,* 199 N. C. 278, 154 S. E. 604. The party alleging error, "not only has the laboring oar, but the tide is also against him. Error must be shown; it will not be presumed." *Cole v. R. R.,* 211 N. C. 591, 191 S. E. 353. This burden does not seem to have been successfully carried in respect of the instant exception. Indeed, the defendant's generous treatment of his wife when sober, was attested by the State's own witnesses, and no doubt the trial court thought the defendant was only belaboring a matter which was conceded or really not disputed. Without approving the ruling, we do not sustain the exception, as no baneful consequence has been made to appear.

3. The defendant sought to show by Dr. J. F. Owen, a psychiatrist, that at the time of the homicide he was not capable of forming a deliberate and premeditated purpose to kill, with appreciation and understanding of what he was doing. On cross-examination, the prosecution was allowed to ask the witness whether he was being paid to testify for the defendant. His answer was that he made no statement about testifying, but that he charged the defendant $500, and that he would not have been there if he had not been paid. "Q. So, you merely came here in the capacity of a paid employee and a paid witness for the defendant?" A. "Yes, sir." Objection; overruled; exception. This examination was permissible to test the bias or partiality of the witness towards the party by whom he was called or introduced. *Johnson v. R. R.,* 163 N. C. 431, 79 S. E. 690; *S. v. Beal, supra;* Wigmore on Evidence (3d Ed.), Sec. 961. The exception is not sustained.

4. The defendant called his father as a witness to testify concerning his mental condition shortly after the homicide when the defendant stopped to inform him of the killing; also to tell, in a general way, to what extent the defendant had been drinking lately and the effect it had had upon his mind. On cross-examination, the prosecution was allowed to inquire into the defendant's business activities, the extent of his farming operations, his management of a large tobacco warehouse in Smithfield, etc. Objection; overruled; exception. This examination was permissible to show the defendant's mental capacity despite his use of intoxicants. The exception is not sustained.

The prosecution was also allowed to show by the cross-examination of this witness that the defendant had been twice married and twice divorced before his marriage to the deceased. Objection; overruled; exception.

STATE *v.* CREECH.

It must be conceded that the admission of this evidence was an inadvertence. It was neither relevant nor material to the charge upon which the defendant was being tried. It was incompetent, but its prejudicial effect is without support or confirmation on the record. *S. v. Perry,* 226 N. C. 530, 39 S. E. (2) 460. *Cf. Lasater v. State* (Tex. Crim. App.), 227 S. W. 949. The defendant was being tried in the county where he had lived from boyhood. He was well known, and no doubt the jury was acquainted with his entire career. Nevertheless, disregarding the common knowledge of the community, the admission of this evidence does not appear to have had any appreciable effect on the verdict. "Admittedly, such evidence was incompetent, though not prejudicial." *Payne v. Com.,* 255 Ky. 533, 75 S. W. (2) 14. It is not enough for the appellant to show error, and no more. He must make it appear that he was prejudiced thereby. *S. v. Perry, supra; S. v. King,* 225 N. C. 236, 34 S. E. (2) 3. The ruling is disapproved, but the exception is not sustained for the reason that only a harmless inadvertence has been made manifest.

III. *Exceptions to the charge:* The defendant entered upon the trial with the common-law presumption of innocence in his favor and with the burden on the prosecution to establish his guilt beyond a reasonable doubt. *S. v. Singleton,* 183 N. C. 738, 110 S. E. 846. His plea of traverse put his guilt in issue. *S. v. Harvey,* 228 N. C. 62, 44 S. E. (2) 472. On the trial he neither admitted the killing, nor did he take the witness stand. It was therefore incumbent upon the prosecution to make out the case in all of its elements or to establish the guilt of the defendant beyond a reasonable doubt. *S. v. Grass,* 223 N. C. 31, 25 S. E. (2) 193. This, the prosecution proceeded to do by first establishing an intentional killing with a deadly weapon. Then evidence was offered tending to show premeditation and deliberation, which, with the presumptions arising from an intentional killing with a deadly weapon, was sufficient to establish the crime of murder in the first degree. *S. v. Floyd,* 226 N. C. 571, 39 S. E. (2) 598; *S. v. Harris,* 223 N. C. 697, 28 S. E. (2) 232; *S. v. Evans,* 198 N. C. 82, 150 S. E. 678.

In this connection there is one exception directed to a portion of the charge which deserves immediate attention. In a single instance, touching the question of presumptions, the court instructed the jury that, "If the State has satisfied you beyond a reasonable doubt that the defendant killed the deceased with a deadly weapon, as I have said, the law presumes that it was done with malice, . . . and (if) you find beyond a reasonable doubt that the defendant intentionally killed the deceased with malice, it would be your duty to return a verdict of guilty of murder in the second degree, subject to the instructions that will be hereafter given you as to responsibility or mental capacity."

The criticism of this instruction is that the presumption of malice was made to rest on the killing of the deceased by the defendant with a deadly

STATE v. CREECH.

weapon without regard to whether the killing was intentional. *S. v. McNeill, ante,* 377; *S. v. Snead,* 228 N. C. 37, 44 S. E. (2) 359; *S. v. Childress,* 228 N. C. 208, 45 S. E. (2) 42; *S. v. Debnam,* 222 N. C. 266, 22 S. E .(2) 562. The exception is untenable because on several previous occasions the court had stated the presumption could arise only from an intentional killing with a deadly weapon, and the expression, "as I have said," refers to these previous instances. Moreover, before concluding the instruction the *lapsus linguæ* was corrected. *S. v. Davis,* 223 N. C. 381, 26 S. E. (2) 869; *S. v. Utley,* 223 N. C. 39, 25 S. E. (2) 195. The exception is not sustained.

The real debate, however, was over the defendant's contention, based on evidence offered and elicited by him, that he was in such a state of mental confusion, superinduced by chronic alcoholism, as not only to render him incapable of premeditation and deliberation, but also to deprive him of any moral perception or legal responsibility for his acts.

In submitting this phase of the case to the jury, the trial court followed closely the adjudications on the subject, especially the case of *S. v. Murphy,* 157 N. C. 614, 72 S. E. 1075, which he evidently had before him when charging the jury. The court's instructions also reveal an acquaintance and familiarity with and a flavoring of the following cases: *S. v. Hairston,* 222 N. C. 455, 23 S. E. (2) 885; *S. v. Cureton,* 218 N. C. 491, 11 S. E. (2) 469; *S. v. Alston,* 215 N. C. 713, 3 S. E. (2) 11; *S. v. Bracy,* 215 N. C. 248, 1 S. E. (2) 891; *S. v. Edwards,* 211 N. C. 555, 191 S. E. 1; *S. v. Alston,* 210 N. C. 258, 186 S. E. 354; *S. v. Walker,* 193 N. C. 489, 137 S. E. 429; *S. v. Ross,* 193 N. C. 25, 136 S. E. 193; *S. v. English,* 164 N. C. 497, 80 S. E. 72; *S. v. Shelton,* 164 N. C. 513, 79 S. E. 883; *S. v. Allen,* 186 N. C. 302, 119 S. E. 504; *S. v. Hancock,* 151 N. C. 699, 66 S. E. 137; *S. v. Kale,* 124 N. C. 816, 32 S. E. 892. Indeed, some of the instructions are couched in the very language of the decisions.

It is the law of this jurisdiction that an affirmative defense, *e.g.,* drunkenness or insanity, which partakes of the nature of a plea of confession and avoidance, is to be satisfactorily proved by the defendant unless it arise out of the evidence produced against him. *S. v. Swink, ante,* 123; *S. v. Hammonds,* 216 N. C. 67, 3 S. E. (2) 439; *S. v. Alston,* 214 N. C. 93, 197 S. E. 719; *S. v. Keever,* 177 N. C. 114, 97 S. E. 727; *S. v. Craton,* 28 N. C. 178. The *onus* of showing "justification, excuse or mitigation," to the satisfaction of the jury, is on the defendant. *S. v. Willis,* 63 N. C. 26; *S. v. Carland,* 90 N. C. 668; *S. v. Brittain,* 89 N. C. 481; *S. v. Ellick,* 60 N. C. 456 (see note to this case in 3 Anno. Ed.). "Matters in extenuation and excuse, or of discharge by reason of insanity," are for the defendant. *S. v. Jones,* 191 N. C. 753, 133 S. E. 81. "All matters of excuse or mitigation devolve upon the prisoner." *S. v. Rollins,* 113 N. C. 722, 18 S. E. 394.

Speaking to the question in *S. v. Foster,* 172 N. C. 960, 90 S. E. 785, *Walker, J.,* delivering the opinion of the Court, said : "That the burden is upon the prisoner to satisfy the jury by proof of any matters of justification, excuse, or mitigation has been too long settled to be now questioned. The jury were instructed that the burden was upon the State to establish beyond a reasonable doubt that the prisoner killed the deceased with premeditation and deliberation. The charge was correct and in accordance with the authorities."

Finally the whole matter in respect of the burden of proof and the burden of satisfaction, where insanity or mental debility is interposed as a defense, is thoroughly discussed in the case of *S. v. Harris,* 223 N. C. 697, 28 S. E. (2) 232, and it would only be a work of supererogation to restate it here. The presumption that the accused was sane and responsible for his acts persists until the contrary is shown to the satisfaction of the jury. Therefore, if the jury are left in doubt as to the sanity or responsibility of the accused, the presumption prevails. *S. v. Smith,* 77 N. C. 488.

As a *dernier ressort* the defendant says that while no one of his exceptions, standing alone, may be sufficient to work a new trial, nevertheless taken in their totality, they make it quite clear that the scales of justice were weighted against him, *S. v. Hart,* 186 N. C. 582, 120 S. E. 345, and that in no event should a case of this importance be upheld on the doctrine of harmless error.

The position might prevail but for the conduct and declarations of the defendant on the night of the homicide which clearly revealed his stubborn purpose and unbending will to kill the deceased, even over the efforts of those in the house to protect her, and an immediate consciousness· of wrong which prompted the defendant to seek the sheriff's office, knowing full well that as between himself and the officers it was only a question as to who would make the call first. At any rate, these are the overshadowing facts of the record, and the jury has found them to be true. Not until the defendant reached the jail did he make any self-serving declaration. He then, for the first time, said to the jailer, "I am as crazy as hell." This was his last comment on the subject so far as the record discloses.

True it is, that the atrocity of the defendant's conduct was a circumstance from which opposite conclusions were sought to be drawn; the one that it exhibited a mind fatally bent on mischief; the other that it revealed a diseased intellect. The jury attributed it to the former.

The test of responsibility is the capacity to distinguish between right and wrong at the time and in respect of the matter under investigation. *S. v. Potts,* 100 N. C. 457, 6 S. E. 656; *S. v. Brandon,* 53 N. C. 463. He who knows the right and still the wrong pursues is amenable to the criminal law. *S. v. Jenkins,* 208 N. C. 740, 182 S. E. 324. On the other hand, if "the accused should be in such a state of mental disease as not

to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing wrong," the law does not hold him accountable for his acts, for guilt arises from volition, and not from a diseased mind. *S. v. Haywood,* 61 N. C. 376.

We are aware of the criticism of this standard by some psychiatrists and others. Still, the critics have offered nothing better. It has the merit of being well established, practical and so plain "that he may run that readeth it." Hab. 2 :2. Moreover, it should be remembered that the criminal law applies equally to all sorts and conditions of people. It ought to be sufficiently clear to be understood by the ordinary citizen.

The conclusion is reached that no reversible error has been made to appear. Hence, the verdict and judgment will be upheld.

No error.

BARNHILL, J., dissenting: Error in the trial below is conceded. The majority are of the opinion the errors committed are not of sufficient moment to require a new trial. I regret to find myself in disagreement. Yet, after careful study of the record I am forced to the conclusion that the errors to which reference is made in the majority opinion, as well as others not mentioned, were sufficiently prejudicial to the defendant to require a new trial.

The testimony in the case presents this picture:

The defendant, a man about thirty-seven years of age, is addicted to the use of liquor. At times he would get on a spree. He was then disagreeable, quickly irritated, and rough in manner and conduct, abusing and assaulting his wife. She would leave him and return after he sobered up. While they were separated their relations seemed to be pleasant. She would go to his house, and he would visit the home in which she was staying, and they consulted each other about matters of mutual interest. They separated for the last time sometime prior to the homicide. During the week preceding the homicide, he went to Georgia. Before leaving, he sent her $100, gave her the name of the hotel at which he would stop, and told her to get in touch with him if she needed him. When he returned, he learned she had gone to Duke, and he called to inquire about her condition. When told she was at Duke, he said that if she was sick he hoped she would get well, and also said, as a part of the same statement, that he wished that she was dead, wished that he could wake up in the morning and hear that she was dead, that that would be the sweetest music he had ever heard. He had been drinking at the time.

On the night of the homicide he went to the home where she was staying and talked to her and the members of the household in a pleasant manner. He and deceased discussed her trip to Duke, and she told him about the X-ray photographs which were taken. He offered those present

some whisky and some peaches. When he got ready to leave, he asked her if she was going with him. When she said no, he flew into a rage and told her she could see his lawyer the next day. He left, drank more liquor, and returned. When he entered the house he had his gun, which he usually carried in his car, with him. The members of the family went into the middle bedroom, and Mrs. Elsie Mae Creech, Johnnie Grimes, and the deceased held the door to keep him from entering. The deceased was crouched down low with the right side of her head and her right shoulder against the middle of the door. He tried several times to shove the door open. Failing in that, he fired through the door. The load of shot struck the deceased in the right side of her head, scattering blood on the door, on Mrs. Elsie Creech, on the floor, and on the bed to the rear. Deceased immediately slumped down on the floor and never moved. Later she was examined by Johnnie Grimes. Her body was then lifeless. "I would say she was dead."

After the first shot was fired, the family ran out. Defendant went on the back porch and called Johnnie Grimes several times. He also went out in the back yard. He then, some minutes later, went into the room where the body was lying, turned on the light, pointed his gun in the direction of the body and fired. Whether this load struck the body of deceased is not made to appear. He then left and later surrendered to the sheriff.

The homicide was committed on the night of July 28. The defendant, on August 11, in a preliminary hearing, was committed to jail without bond. The defendant promptly served notice of intention to take the depositions of out-of-state witnesses, the hearing being set for August 21. On the morning of August 18, about noon, the Grand Jury returned a true bill. The court thereupon, of its own motion, ordered a special venire of 250 men to be drawn from the body of the citizenship of the county and set the trial for hearing on the following morning at 9:30, at which time the defendant was put on trial for his life.

The criminal law should be promptly and efficiently enforced. This applies with particular force when a crime such as the one portrayed by this record is committed. The slaying was inexcusable and the defendant should be punished according to the degree of the crime he committed. For him I hold no brief. But the law itself demands that the life of a citizen shall not be exacted for a crime until he has first been convicted in a trial as fair and free from error as it is humanly possible to make it. *S. v. Howell,* 218 N. C. 280, 10 S. E. (2) 815. Being convinced, as I am, that the defendant has not been accorded that type of trial, but that instead the able and conscientious judge who presided inadvertently committed errors during the trial which of necessity must have influenced the verdict of the jury, I am compelled to register my dissent and to state, as briefly as I can, the reasons which prompt me to do so.

STATE v. CREECH.

Much could be said about the disposition of the motion for continuance. The defendant was allowed less than a day in which to summon and consult witnesses and no time in which to examine the list of special veniremen. But I do not rest my dissent on that ruling. Perhaps the defendant has not brought his case within the principle that controlled decision in *S. v. Farrell,* 223 N. C. 321, 26 S. E. (2) 322. Even so, we must always remember that undue haste, particularly in cases of this type, will pervert justice as surely as unnecessary delay will defeat it.

The State was permitted to prove, over objection, that the defendant was engaged extensively in farming operations, was a tobacco warehouseman and the son of one of the largest farmers of the community. These facts have no bearing on the guilt or innocence of the defendant. Yet the judge considered them of such importance that he reviewed them in detail in his charge to the jury. Thus he indicated that he thought they were facts to be considered by the jury.

No doubt at least some of the jurors knew these facts, but they did not know they were facts to be considered against the defendant on the question of his guilt or innocence. Yet they were so used. A man's wealth, position, or prominence should not avail him in a court of justice. Neither should they be used against him.

Likewise, the court permitted the State to prove that the defendant had been twice married and twice divorced before he married the deceased. These facts have no bearing whatever on the question at issue. Even so, the court gave them emphasis and importance by reviewing them in detail in his charge.

What more did an able, forceful solicitor desire than proof that defendant killed the deceased, that he was a wealthy son of a prominent citizen and had been divorced twice, with permission of the judge to use such proof in his argument? It laid a perfect foundation for the argument that defendant now, on this fateful night, was about the business of ridding himself of a third unwanted spouse. No doubt it was so used. If it was not, then the solicitor muffed his best bet on the evidence admitted, and the fact remains that it was submitted to the jury for their consideration in the charge of the court.

The assignments of error based on the admission of evidence to which I have referred, in my opinion, require a new trial. But there are others of even more serious nature.

All the testimony tends to show that the deceased was killed by the first shot, fired through the door. There is no evidence that she was alive when defendant fired the second shot at her body some time later.

The court below, however, inadvertently did not so construe the testimony. It charged the jury in part as follows:

"The State says and contends that . . . while out on the outside of the house he turned and went back in the house and turned on the light and

took his shotgun and aimed at the prostrate body of his wife lying upon the floor and shot her again in the head. The State says and contends that that shows a determination on his part to carry out and execute completely his previously formed plan and design to take her life.

"In that connection the Court charges you that dealing of the lethal blow after the deceased had been felled, if you find beyond a reasonable doubt she had been felled and rendered helpless and dealt such blows, is evidence from which you could infer premeditated and deliberated purpose to kill."

In addition to the foregoing charge, the court in the statement of contentions more than once referred to the second shot as the one which might have caused death. It, in its charge on the law, instructed the jury in effect that they could find that deceased was killed by the second shot and left it to the jury to find whether it was the first or the second shot that inflicted the fatal wound, though the record is devoid of evidence tending to show that she was alive at the time the second shot was fired. Instead, it conclusively discloses that she was killed by the first shot.

Was this prejudicial? In the first place the court charged the jury that if they found that the first shot killed the deceased they should return a verdict of murder in the second degree or manslaughter. While there is a conflicting charge, this instruction renders it most probable the verdict was rendered upon the assumption that the second shot inflicted the lethal wound. Whether the second shot was deliberately fired or was the act of a person whose mind was deranged by liquor, it was a horrible, repulsive act. If his wife was at the time alive, lying helpless on the floor, it would move any juror to return a verdict of premeditated murder. On this record she was not killed then, under those circumstances. Yet the jury were led to believe they could so find from the evidence offered, and the issue was presented to them squarely and unequivocally for them to decide.

The atrocity of the defendant's conduct in this respect was a circumstance from which opposite conclusions might be drawn—the one that it exhibited a mind fatally bent on mischief; the other, that it revealed a diseased and deranged mind. The manner in which it was submitted to the jury, as substantive evidence of a homicide deliberately committed, constitutes prejudicial and reversible error.

The deceased was killed when the defendant shot through the door. There is no evidence in the record tending to show that he knew that she was then leaning against the door. There is no direct evidence that he knew she was in the room into which he shot. These are the immediate circumstances of the slaying. He should be tried for this homicide thus committed, in the light of all competent evidence, *pro* and *con,* on the issue of premeditation and deliberation. He should not be required to

answer for a homicide under more atrocious circumstances which did not exist. While the second shot constitutes a fact to be considered on the question of premeditation and deliberation, it cannot, on this record, be made the basis of a finding that the homicide was then committed. Yet, under the charge of the court below the jury were permitted to so find. The record in this respect is in such condition that the conclusion the defendant was prejudiced thereby seems to me to be clear.

"The court should never give the jury instructions based upon a state of facts not presented by some reasonable view of the evidence produced on the trial, nor upon a supposed state of facts." *S. v. Wilson,* 104 N. C. 868.

The theory that (1) drunkenness is no excuse for crime, (2) to avail the defendant it must be made to appear that his reason was utterly dethroned, (3) the burden of so showing rests upon him, and (4) the test is the capacity to distinguish right from wrong, permeates the whole charge without distinction between the count of murder in the second degree on the one hand, and murder in the first degree on the other.

We have said many times that voluntary drunkenness is no legal excuse for crime and that to avail the defendant he must show, the burden being on him, that his reason was dethroned to such an extent that he was incapable, at the time, of distinguishing between right and wrong. But in these cases we were discussing crimes in which premeditation and deliberation or other specific intent was not an essential element of the crime charged.

This principle, however, is not allowed to prevail where, in addition to the overt act, it is required that a definite specific intent be established as an essential feature of the crime.

This qualifying rule or exception, if it may be so termed, was first stated and applied to the charge of murder in the first degree after the adoption, in 1893, of the statute which is now G.S. 14-17, dividing murder into two degrees and making premeditation and deliberation an essential element of murder in the first degree. It is fully stated and discussed in *S. v. Murphy,* 157 N. C. 614, 72 S. E. 1075. It is quoted with approval and applied in the following cases: *S. v. English,* 164 N. C. 497, 80 S. E. 72; *S. v. Shelton,* 164 N. C. 513, 79 S. E. 883; *S. v. Foster,* 172 N. C. 960, 90 S. E. 785; *S. v. Allen,* 186 N. C. 302, 119 S. E. 504; *S. v. Williams,* 189 N. C. 616, 127 S. E. 675; *S. v. Ross,* 193 N. C. 25, 136 S. E. 193; and *S. v. Alston,* 210 N. C. 258, 186 S. E. 354. See also *S. v. McManus,* 217 N. C. 445, 8 S. E. (2) 251; 15 A. J. 30, 26 A. J. 381.

"Although drunkenness, in point of law, constitutes no excuse or justification for crime, still, when the nature and essence of a crime is made, by law, to depend upon the peculiar state and condition of the criminal's mind at the time, and with reference to the act done, drunkenness, as a

matter of fact, affecting such state and condition of mind, is a proper subject for consideration and inquiry by the jury." *S. v. Allen, supra.*

"Such testimony of intoxication is admitted, not as a defense, but as showing lack of an essential ingredient of the crime in question." Smoot, Law of Insanity, 38; 1 Wharton's Criminal Law, 12th Ed., 101, 102. It is to be considered, *pro* and *con,* on the issue of premeditation and deliberation. *S. v. Hauser,* 202 N. C. 738, 164 S. E. 114.

"To regard the fact of intoxication as meriting consideration in such a case is not to hold that drunkenness will excuse crime, but to inquire whether the very crime which the law defines and punishes has, in point of fact, been committed." *S. v. Allen, supra.*

This modification of the common law rule has become firmly imbedded in our law, subject to this qualification : Where the evidence shows that the purpose to kill was deliberately and premeditatedly formed when sober, the imbibing of intoxicants to whatever extent in order to carry out the design will not avail the defendant. *S. v. Foster, supra; S. v. Adams,* 214 N. C. 501, 199 S. E. 716; *S. v. Hairston,* 222 N. C. 455, 23 S. E. (2) 885.

The court did, at one time, it is true, state the rule relating to evidence of drunkenness on the first degree count substantially as formulated in our decisions, but he coupled with that statement language which had the effect of placing the burden on the defendant to refute the charge of premeditation and deliberation by showing that "he was utterly unable to form or entertain this essential purpose." This is emphasized by his other statements on the burden of proof.

When it is admitted or proven that the defendant intentionally killed the deceased with a deadly weapon, the presumptions arising from such proof, nothing else appearing, make the crime murder in the second degree. If the defendant would reduce the crime to manslaughter by rebutting the presumption of malice or excuse it altogether on the grounds of self-defense, insanity, or other cause, the burden is on him. Conversely, if the State would raise the crime to murder in the first degree, it has the burden of establishing the additional element of premeditation and deliberation. That burden never shifts. It remains on the State throughout the trial. *S. v. Redman,* 217 N. C. 483, 8 S. E. (2) 623; *S. v. Harris,* 223 N. C. 697, 28 S. E. (2) 232. The State is aided by the presumption of sanity, *S. v. Harris, supra,* but no presumption of premeditation and deliberation ever arises, whatever the defense interposed by the defendant.

"The additional elements of premeditation and deliberation, necessary to constitute the capital offense, are not presumed from a (intentional) killing with a deadly weapon. These must be established beyond a reasonable doubt, and found by the jury, before a verdict of murder in the first degree can be rendered against the defendant." *S. v. Keaton,* 206 N. C.

682, 175 S. E. 296; *S. v. Davis,* 214 N. C. 787, 1 S. E. (2) 104; *S. v. Redman, supra; S. v. Harris, supra.* The presumption of innocence prevails until overcome by evidence of the truth of the criminal charge, and this must be such as to remove all reasonable doubt from the minds of the jury. *S. v. Potts,* 100 N. C. 457; *S. v. Williams, supra.*

When the State offers evidence of premeditation and deliberation, defendant may elect either to offer evidence in rebuttal or take the risk of an adverse verdict. *S. v. Peterson,* 225 N. C. 540, 35 S. E. (2) 645. Thus he may offer evidence of drunkenness to be considered by the jury on that issue, but that does not mean that the burden shifts or that he must show that "he was utterly unable to form or entertain this essential purpose." He offers the evidence, not as a defense but in rebuttal, to be considered by the jury on that phase of the case.

There are, it is true, statements in some of our decisions which seem to point in the other direction. These, perhaps, misled the able trial judge. But to so hold would create two irreconcilable rules respecting the same matter. The State must prove premeditation and deliberation, but if defendant relies on drunkenness in rebuttal, he must prove that he was utterly incapable of forming a specific intent. If the State fails to prove premeditation and deliberation and the defendant fails to show incapacity to form any specific intent, what then? Is he to be convicted of the capital felony? Once you put the burden on him, that would be the only reasonable conclusion. That is to say, the State must prove premeditation and deliberation unless the defendant relies upon drunkenness. In that event, this element is conclusively presumed unless the defendant successfully rebuts it. Such is not the law.

There are other exceptions in the record which well might command consideration. Yet, if the ones I have discussed do not warrant a new trial, neither would they, and so I do not extend the discussion further.

There is evidence in the record to sustain the charge of murder in the first degree, and it may be that upon a retrial the same result will be reached. And yet, it is important that a defendant shall not suffer the penalty of death until he has been convicted in a trial in which there has been a scrupulous observance of constitutional and statutory safeguards, protecting and preserving his rights. When there is a general plea of not guilty, as here, and no admission of an unlawful killing, the death penalty should be exacted only upon the verdict of a jury which has been given full opportunity to pass upon the weight and credibility of the evidence without the injection of extraneous matter and under instructions which correctly apply the pertinent principles of law. *S. v. Howell, supra.* I am of the opinion that the prisoner has not been accorded that type of trial, so very essential in cases involving capital punishment. Therefore, I vote for a new trial.

ERVIN, J., dissenting: In my judgment, the prisoner ought to be granted a new trial for the reasons set forth in the foregoing opinion of *Mr. Justice Barnhill.*